OPINION
Defendants-appellants the Ohio High School Athletic Association and Clair Muscaro, its Commissioner, appeal from the August 13, 1999, Judgment Entry Nunc Pro Tunc of the Stark County Court of Common Pleas granting a preliminary injunction enjoining defendants-appellants from enforcing their decision of June 10, 1999, declaring plaintiff-appellee Jessie Scott ineligible to participate in interscholastic athletics at/for Massillon Washington High School.
STATEMENT OF THE FACTS AND CASE, Defendant-appellant the Ohio High School Athletic Association (OHSAA) is a voluntary, unincorporated, not-for-profit association of public and private high schools and 7th-8th grade schools which has as its purpose the regulation, supervision and administration of interscholastic athletic competition among its member schools. Both Massillon Perry High School and Massillon Washington High School are member schools of the OHSAA. Individual students, however, are not eligible for membership. As Commissioner of the OHSAA since 1990, defendant-appellant Clair Muscaro has sole responsibility for interpreting the OHSAA's Constitution, Bylaws and Regulations and for determining whether such Bylaws have been violated. OHSAA Bylaw 4-9-2 on recruiting states as follows: "The use of influence by any person connected or not connected with the school to secure or to retain a prospective athlete is not permitted and shall cause the student to be ineligible upon transfer and shall jeopardize the standing of the school in the Association." (Emphasis added.) The term "influence" is not defined in the OHSAA's Constitution, Bylaws or Regulations. OHSAA Bylaw 4-9-4 provides that "No employee of the school system shall initiate any communication with a prospective athlete, parents of an athlete, guardian or family member, in person or through a third party prior to enrollment. Plaintiff-appellee Jessie Scott, on or about January 25, 1999, transferred from Perry High School and enrolled at Massillon Washington High School. Thereafter, pursuant to a letter dated February 11, 1999, Keith Wakefield, the head football coach at Perry High School, complained to OHSAA Commissioner Clair Muscaro that plaintiff-appellee Jessie Scott had been recruited "by individuals close to Massillon Washington High School football staff." According to Coach Wakefield's letter, such individuals, over a period of time commencing in January of 1998, had used influence to lure plaintiff-appellee Jessie Scott to Massillon Washington High School. The following is an excerpt from the February 11, 1999, letter from Coach Wakefield to Commissioner Muscaro: "From last January 1998 to this January 1999, phone calls and visits by individuals have taken place by the admission of Mr. and Mrs. J.C. Scott [plaintiff-appellee Jessie Scott's parents] I will try to document to the best of my ability things that were discussed between the Scott family, including Jessie and myself.
There is no question in our minds, myself and administration at Perry, that influence was used to lure Jessie Scott to Washington High School.
January — 1998
Mrs. Jackie Scott (Jessie's Mother) discussed with me that "people" from Massillon have been calling her at home and talking to her about Jessie transferring. No names of those individuals was discussed at that time. She tells me at that time they "love" Perry and have no intention of leaving.
May-June — 1998
Mrs. Scott again relates to me that phone calls are still being made by individuals close to the football program at Washington High School. Mrs. Scott also tells me that someone has visited their house and stayed for forty-five minutes discussing Jessie going to Washington High School. I asked her who visited and who has been calling. The name that is mentioned is a "Mr. David" — no first name is given . . .
November — 1998
Jessie Scott discusses with me the possibility of going to Washington High School because he has been told that he will get the ball more in their offense than in ours. He relates to me that they have been calling him all season. I tell Jessie that with more consistency he could be that type of player for us. But no promises are made.
January 25, 1999
Jessie Scott is telling people in our school that he will be leaving to go to Washington High School at semester break. He has failed three of five classes the second grading period. I talk to Jessie that morning about him leaving and he tells me it's his mother's decision. But his comment to me is that "they" have told him he will get the ball much more in their offense than in ours. I called Jackie Scott at 1:00 pm at work and discuss the situation with her. She explains that it is no rumor and Jessie will leave Perry because his opportunities are better at Massillon.
February 10, 1999
The Scott's (Jackie and J.C.) met with our Athletic Director (Frank Gamble) and our Superintendent (Ken Hartwick) to discuss Jessie leaving Perry. The Scott's do not give any names as to who was calling them. They also deny that anyone visited their home. They do admit to Jessie being called and recruited by people from Massillon. Mrs. Scott comments that there are a lot of other boys they are still after to transfer.
A copy of Coach Wakefield's complaint was served on Massillon Washington High School, which was notified that the complaint was being investigated by the OHSAA. The OHSAA hired Attorney Greg Beck to conduct an independent investigation. At the conclusion of his investigation, Attorney Beck recommended that Commissioner Muscaro conduct a hearing on Coach Wakefield's complaint. A 13 hour hearing on the allegations raised in such complaint was held on May 26, 1999. Plaintiff-appellee Jessie Scott was present at part of the proceedings along with his parents, plaintiffs-appellees J.C. Scott and Jacqueline Scott. However, plaintiff-appellee Jessie Scott was not a party to the proceedings. Officials from both Massillon Perry High School and Massillon Washington High School also were present. Coach Wakefield testified at length at the May 26, 1999, hearing. Coach Wakefield testified that he first learned about the alleged attempted recruiting of plaintiff-appellee Jessie Scott in January of 1998 when plaintiff-appellee Jacqueline Scott, Jessie's mother, "briefly mentioned that she had been contacted by some people at Massillon possibly for Jessie to come there and to be an athlete there." Transcript of OHSAA hearing at 50. Coach Wakefield testified that he did not question Mrs. Scott in detail regarding the nature of the contact or the name of the person making the contact. Nor did Coach Wakefield know the specific date of the contact. After hearing rumors in May of 1998 that someone had made a visit to the Scott home, Coach Wakefield telephoned plaintiff-appellee Jacqueline Scott, who told him that a "Mr. David" had visited the Scott home for approximately 45 minutes. Transcript of OHSAA hearing at 53. According to Coach Wakefield, Mrs. Scott, who was unsure of Mr. David's first name, stated at such time that she "love[d] "Perry and was "fine here". Transcript of OHSAA hearing at 54. Coach Wakefield testified that a high school coach later told him that "Mr. David" was Jeff David. Coach Wakefield also testified regarding a conversation that he had with plaintiff-appellee Jessie Scott during the 1998 football season. Jessie, Coach Wakefield testified, "mentioned to me that he and his mother had conversations about possibly going to another school and I said, where, Massillon? I said it to him. And he said yes." Transcript of OHSAA hearing at 55-56. According to Coach Wakefield, "the comment [by plaintiff-appellee Jessie Scott] was to me that they-whoever they is, there was no name mentioned-that they feel that he would be used a lot [sic] more there than he is at Perry. I got that inference that that was being said to him. " Transcript of OHSAA hearing at 56. Coach Wakefield was unable to say whether plaintiff-appellee Jessie Scott was contacted by phone or in person and did not know the specifics of the alleged contact. Coach Wakefield also testified that after the football season ended, he had another discussion with plaintiff-appellee Jessie Scott regarding recruiting. The following is an excerpt from Coach Wakefield's testimony at the May 26, 1999, OHSAA hearing: ". . . And I felt that way as he brought up the same points, just the points of that there were conversations with his family that possibly he would even go to another school and it was Massillon and the same type of idea that he would be able to handle the ball more and do more things for them. It was the same inference that I got after the week 8.
 Q. Did Jessie represent to you that there were certain representations made by Massillon during this conversation?
 A. Yes. And the other thing that was brought up at this point was that, you know, I got — again, I got a direct feeling that he was being called through the season, not just those two incidents. And again, I don't have phone records or I can't testify to that, but I believe there was inference that he had been talked to during the season.
Q. Why would you say that?
 A. Well, just by — I mean, it didn't sound random to me. It sounded like it was consistent and just continually calling. I just had that feeling.
 Q. Did Jessie talk to you at all about any specific representation that they made, that had supposedly made by Massillon about what he would do for their offense or how many carries he would have?
 A. Yeah. There was a mention of — you know, again whether they told him the mention of 20 carries or more or handle the ball 20 or more times, you know, that was brought up.
Q. By Jessie?
A. Yeah. . . . Transcript of OHSAA hearing at 58-59.
After he learned, on January 25, 1999, that plaintiff-appellee Jessie Scott was actually transferring to Massillon Washington High School, Coach Wakefield contacted plaintiff-appellee Jacqueline Scott, Jessie's mother. Coach Wakefield alleges that plaintiff-appellee Jacqueline Scott told him that an unknown "they" were going to use Jessie better and to provide him with more opportunities. Transcript of OHSAA hearing at 63. While Coach Wakefield admitted that he was ethically required to notify the OHSAA of any recruiting violations, he did not notify the OHSAA of the alleged recruiting violations until after plaintiff-appellee Jessie Scott had actually transferred. Coach Wakefield testified that he did not notify the OHSAA before such time since he felt that, because of his good relationship with the Scott family and of his control over plaintiff-appellee Jessie Scott, he would be able to retain Jessie at Perry High School. When questioned why he had not notified Commissioner Muscaro after the alleged home visit by "Mr. David," Coach Wakefield responded that plaintiff-appellee Jacqueline Scott "said Coach, I want it to stop, . . . I love Perry, I'm not going anywhere, my boy is staying here." I said, are we okay with this, and she said, I'm fine." Transcript of OHSAA hearing at 83. Coach Wakefield further agreed with the statement that "[b]ut in your mind, because you thought you were in control, that was more important to you than notifying this Board of this alleged violation." Transcript of OHSAA hearing at 84. Coach Wakefield also testified that he had no knowledge whether any money, tuition, employment, books, tickets, uniforms, supplies or anything else of value was offered to plaintiff-appellee Jessie Scott to influence him to transfer to Massillon Washington High School. Sandy Mercorelli, a bus driver for Perry High School, also testified at the May 26, 1999, hearing. Mercorelli testified that she has known plaintiff-appellee Jacqueline Scott for approximately 15 years, that she sat and talked with plaintiff-appellee Jacqueline Scott at sporting events, and that she transported the Scott children to athletic events. During the spring of 1997, plaintiff-appellee Jacqueline Scott, Mercorelli testified, "said something along the lines that Massillon was calling her home and that Jessie would never go to Massillon." Transcript of OHSAA hearing at 130. During a subsequent conversation in late 1997 or early 1998, plaintiff-appellee Jacqueline Scott once again told Mercorelli that "Massillon is still calling for Jessie, but he will never go to Massillon." Transcript of OHSAA hearing at 132. At no point did plaintiff-appellee Jacqueline Scott tell Mercorelli the names of anyone who had called, the dates of the calls, or the details of what was said during such calls. Nor did Mercorelli know whether money, tuition, employment, books, tickets, uniforms, supplies, or anything else of value had been offered to the Scott family to recruit Jessie. When asked whether the phone calls had changed plaintiff-appellee Jacqueline Scott's mind, Mercorelli responded as follows: `Not at that time, because she said to me, "My Jessie will not go to Massillon.'" Transcript of OHSAA hearing at 140. In addition to the above witnesses, Bridgett Frantz, who had been Jessie's track coach for four years and who had a close relationship with him, testified at the May 26, 1999, hearing. Coach Frantz testified that in late July or early August of 1998, plaintiff-appellee Jessie Scott called her at home asking for advice as to whether he should attend Massillon Washington High School. Jessie, Coach Frantz testified, told her that people from Massillon were calling his home and speaking with him or his mother. He did not, however, tell her the names of the callers when the calls had been made, or specifically what was said during the calls. Nor did plaintiff-appellee Jessie Scott indicate to Coach Frantz that he had been offered anything of value during the calls. Although Coach Frantz believed that the phone calls to Jessie were unethical, she did not immediately notify anyone of the alleged recruiting violations since "[w]hen we got back to school [in the fall of 1998] I just thought the issue was over." Transcript of OHSAA hearing at 149. Other Perry High School officials, including Superintendent Ken Hartwick and Athletic Director Frank Gamble, testified that the plaintiffs-appellees made statements that plaintiff-appellee Jessie Scott was being recruited by Massillon Washington High School. Until Coach Wakefield's February 11, 1999, letter, however, no one reported the alleged recruiting violations to the OHSAA. At the May 26, 1999, hearing, plaintiffs-appellees Jessie Scott and his parents, Jacqueline Scott and J.C. Scott, testified as did Devon Scott, Jessie's brother. All emphatically denied that they had ever been contacted by telephone or in person by anyone attempting to influence plaintiff-appellee Jessie Scott to go to Massillon Washington High School. When plaintiff-appellee Jacqueline Scott was asked whether anyone named Mr. David came to her house, she responded as follows: "About recruiting, no." Transcript of OHSAA hearing at 394. When asked whether the Scott family would have been influenced by any third party, plaintiff-appellee Jacqueline Scott responded that "[w]e make up our own minds." Transcript of OHSAA hearing at 404. The Scott family testified that Jessie's decision to transfer to Massillon Washington High School was a family decision based on numerous factors that was made in the best interests of plaintiff-appellee Jessie Scott and the Scott family. Plaintiff-appellee J.C. Scott testified that his son Jessie had transferred to Massillon Washington High School so that he would have a better chance to play more and hopefully would get a better scholarship. According to plaintiff-appellee J. C. Scott, "[w]hen they [the University of Akron] offered Devon [Jessie's brother] a scholarship they asked me why he was in Perry . . . they figured he should have been in one of the better — I shouldn't say better school, bigger schools . . . they made me think they were more or less schools scared to give him a scholarship." Transcript of May 25, 1999, hearing at 283. According to plaintiff-appellee J.C. Scott, Gerry Faust, the head coach at the University of Akron, and another coach from Eastern Michigan both told him that colleges look at the bigger schools such as Massillon Washington High School. Transcript of OHSAA at 283. Plaintiff-appellee Jessie Scott also testified that "it goes back to the scholarships. Massillon does usually have more athletes get Division I scholarships from their school than Perry does. . . . I think I would have a better opportunity at Massillon." Transcript of OHSAA hearing at 358. He also testified that he wanted to be more active in the offensive. Devon Scott, Jessie's brother, testified that Jessie was dissatisfied with his situation at Perry High School because he was not getting enough playing time and believed that "his prospects of becoming an outright starter as a junior were slim and he [was] concerned about going the next level and playing." Transcript of OHSAA hearing at 323. Devon Scott, who had played football at the University of Akron, recommended that Jessie transfer to Massillon Washington High School since a bigger school would give Jessie more visibility. Since the Scott home was in close proximity to Washington Massillon High School, plaintiff-appellee Jessie Scott had friends who had transferred to Massillon and were playing on the football team there. The Scott family also voiced concerns over the substandard track facilities at Perry High School and Perry's financial situation, including its ability to pass a levy. Plaintiff-appellee Jacqueline Scott testified that she didn't want to get into a "pay to play" situation at Perry High School again. Transcript of OHSAA hearing at 424. She admitted that she didn't do her homework regarding Massillon Washington High School's financial status "because I didn't know Massillon was going to come up with a levy. I might have said let's move to McGregor with my mom and go there." Transcript of OHSAA hearing at 425. Following the OHSAA hearing, on June 10, 1999, defendant-appellant Clair Muscaro issued a decision that Massillon Washington High School had violated Bylaw 4-9-2 since "individuals from Massillon made telephone calls and other contacts with the Scott family members and . . . the purpose of these calls and contacts was to influence the Scotts to transfer Jesse's enrollment from Perry High School to Massillon Washington High School." For such reason, Commissioner Muscaro ruled that plaintiff-appellee Jessie Scott was ineligible to participate in any OHSAA sponsored sport at/for Massillon Washington High School, but that plaintiff-appellee Jessie Scott would be eligible at any other school provided that he met all other OHSAA eligibility requirements. In addition, Commissioner Muscaro penalized Massillon Washington High School by placing the school's football program on probation for a period of three years and requiring the school to forfeit to OHSAA any gate receipts that the school might receive as a result of qualifying for the OHSAA state football playoffs for a period of three years. On July 9, 1999, plaintiffs-appellees Jessie Scott, J.C. Scott and Jacqueline Scott filed a verified complaint for declaratory judgment, injunction and equitable relief against defendants-appellants the OHSAA and Clair Muscaro, its Commissioner. On the same date, plaintiffs-appellees filed a motion for a temporary restraining order and preliminary and permanent injunction. A brief in opposition was filed by defendants-appellants on July 13, 1999. Thereafter, pursuant to a Judgment Entry filed the next day, the trial court granted the motion for a temporary restraining order. An evidentiary hearing on plaintiffs-appellees' motion for a preliminary injunction was held in July of 1999. At the request of the trial court, both parties subsequently submitted proposed findings of fact and conclusions of law. Thereafter, the trial court, pursuant to a Judgment Entry filed on August 10, 1999, granted plaintiffs-appellees' motion for a preliminary injunction, finding, in part, that defendant-appellant Clair Muscaro's decision ruling plaintiff-appellee Jessie Scott ineligible to participate in any OHSAA sponsored event at/for Massillon Washington High School was the result of mistake and was arbitrary. The trial court, in its entry, specifically ordered as follows: "Having so found, and pursuant to Long v. OHSAA 1991 WL 2078981 (Ohio App. 5 Dist.), the Defendants, the OHSAA and Mr. Muscaro, their agents, servants, employees, attorneys, and all persons in active concert and participation with them are hereby enjoined from interfering in any way with Plaintiff Jessie Scott's rights under the Ohio Open Enrollment Statute to enroll in Massillon Washington High School students, including but not limited to, participation in interscholastic athletics for Massillon Washington High School.
The Defendant, OHSAA and Mr. Muscaro, their agents, servants, employees, attorneys, and all persons in active concert and participation with them are hereby enjoined from instructing, encouraging, securing, or retaining any other person or school district, including but not limited to, the Massillon City Schools, from interfering in any way with Jessie Scott's rights under Ohio's Open Enrollment Statute to enroll in Massillon Washington High School and enjoy all the rights and privileges afforded Massillon Washington High School students, including but not limited to, participation in interscholastic athletics at Massillon Washington High School.
The Defendant, OHSAA and Mr. Muscaro, their agents, servants, employees, attorneys, and all persons in active concert and participation with them are hereby enjoined from enforcing or attempting to enforce their decision of June 10, 1999, declaring Plaintiff Jessie Scott ineligible to participate in interscholastic athletics at Massillon Washington High School.
The Defendants, OHSAA and Mr. Muscaro, their agents, servants, employees, attorneys, and all persons in active concert and participation with them are hereby enjoined from enforcing OHSAA Bylaws 4-9-2 and 4-9-4 as written and applied to Plaintiffs for the reasons set forth in this opinion.
The trial court, pursuant to a "Judgment Entry Nunc Pro Tunc" filed on August 13, 1999, added "no just cause for delay" language to its earlier judgment entry. The trial court has yet to schedule a hearing on the merits of the appellees' motion for permanent injunction. It is from the trial court's August 13, 1999, Judgment Entry Nunc Pro Tunc that defendants-appellants prosecute their appeal, raising the following assignments of error:
 CONTINUED ON SCOTT VS. OHSAA — PART II. JESSIE SCOTT VS. OHIO HIGH SCHOOL ATHLETIC ASSOCIATION
ASSIGNMENT OF ERROR I
 THE TRIAL COURT ERRED AS A MATTER OF LAW BY SUBSTITUTING ITS JUDGMENT FOR THAT OF THE COMMISSIONER OF THE OHIO HIGH SCHOOL ATHLETIC ASSOCIATION.
ASSIGNMENT OF ERROR II
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN FINDING PLAINTIFFS MET THEIR BURDEN, BY CLEAR AND CONVINCING EVIDENCE, THAT THERE EXISTS A SUBSTANTIAL LIKELIHOOD OF PROBABILITY OF PLAINTIFFS' SUCCESS ON THE MERITS IN REGARDS TO ARBITRARINESS AND/OR MISTAKE.
ASSIGNMENT OF ERROR III
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN FINDING PLAINTIFFS-APPELLEES PROVED BY CLEAR AND CONVINCING EVIDENCE THAT PLAINTIFFS-APPELLEES WOULD SUFFER IRREPARABLE HARM (WITHOUT AN INJUNCTION).
ASSIGNMENT OF ERROR IV
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN FINDING THE INJURY TO OTHERS DOES NOT OUTWEIGH THE INJURY TO PLAINTIFFS-APPELLEES.
ASSIGNMENT OF ERROR V
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN FINDING THAT THE PUBLIC INTEREST WILL BE SERVED BY GRANTING AN INJUNCTION.
ASSIGNMENT OF ERROR VI
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY APPLYING A LESSER STANDARD OF PROOF THAN THE "CLEAR AND CONVINCING" STANDARD REQUIRED BY LAW.
 I-VI
Appellants, in their six assignments of error, challenge the trial court's August 13, 1999 Judgment Entry granting appellees' Motion for a Preliminary Injunction. While there appears to be a difference of opinion as to the scope of the appeal before this Court, the trial court, in its August 13, 1999, entry, expressly stated that its decision "was limited to Plaintiffs' Motion for a Preliminary Injunction" and that it was "only determining whether the Plaintiffs have established the four requirements necessary for the granting of a Preliminary Injunction." Moreover, the trial court, at the July 16, 1999 hearing, stated that "on the record this is an agreement between both sides. The matters regarding this particular hearing will be limited to the preliminary injunction issue only. No further issues before the Court then." Transcript of July 16, 1999 Proceedings at 7. For such reason, this Court shall limit its opinion to a review of the trial court's decision to grant plaintiffs-appellees' Motion for a Preliminary Injunction. Courts, in determining whether to grant injunctive relief, take into consideration the following four factors: (1) the likelihood or probability of a plaintiff's success on the merits; (2) whether the issuance of the injunction will prevent irreparable harm to the plaintiff; (3) what injury to others will be caused by the granting of the injunction; and (4) whether the public interest will be served by the granting of the injunction. Corbett v. Ohio Bldg. Auth. (1993), 86 Ohio App.3d 44,49. The decision whether to grant or deny an injunction rests within the sound discretion of the trial court and will not be disturbed by a reviewing court absent a clear abuse of discretion. Garono v. State (1988), 37 Ohio St.3d 171, 173. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v Blakemore (1983),5 Ohio St.3d 217. We must look at the totality of the circumstances in the case sub judice and determine whether the trial court acted unreasonably, arbitrarily or unconscionably. While appellants, in their sixth assignment of error, maintain that the trial court applied a lesser standard of proof than the "clear and convincing" standard required by law for the issuance of an injunction, there is nothing in the record that affirmatively demonstrates that the trial court, in fact, applied the wrong standard of proof. This court, therefore, must presume the regularity of the lower court's proceedings.
 ISSUE OF PROBABILITY OF SUCCESS ON THE MERITS
The first issue that must be addressed by this Court is whether the trial court abused its discretion in finding that plaintiffs-appellees had demonstrated a likelihood or probability of success on the merits. A trial court, in reviewing a decision of the OHSAA, must defer to reasonable decisions of the OHSAA since "[i]t is a well-established and uniform rule that courts of equity have no authority to interfere with the action of voluntary and unincorporated associations where no property right is involved." State, ex re. Ohio High School Athletic Ass'n. v. Judges of the Court of Common Pleas of Stark County (1962),173 Ohio St. 239, 247, citing 5 Ohio Jurisprudence 2d (1954), 440, Associations, Section 7. However, decisions of the OHSAA are subject to reversal in cases of "mistake, fraud, collusion, or arbitrariness." Id. at 250. See also Long v. Ohio High School Athletic Association (Sept. 26, 1991), Tusc. App. No. 90AP120069, unreported. In determining whether a decision of the OHSAA was arbitrary, "[t]he [trial] court's limited functions are to determine whether the order is supported by reliable, probative and substantial evidence and is in accordance with law." Massillon City School District Board of Education v. Ohio High School Athletic Association (Nov. 5, 1987), Stark App. No. 7247, unreported, citing to Mofu v. State Medical Bd. (1984), 21 Ohio App.3d 182,185. Commissioner Clare Muscaro, in his decision declaring plaintiff-appellee Jessie Scott ineligible to participate in any OHSAA sponsored event at Massillon Washington High School, specifically stated as follows: "The record is replete with references to people from Massillon placing these calls and speaking with either Jesse or Mrs. Scott, although admittedly no specific telephone caller was identified in hearing. Again, it may be suggested that someone from a rival school may have made these calls under the false pretense of being from Massillon. However, it makes no sense that a school or person would recruit a star athlete to go to a rival school against whom they would have to compete. Therefore, on the basis of the evidence before me, I find that individuals from Massillon made telephone calls and other contacts with the Scott family members and that the purpose of these calls and contacts was to influence the Scotts to transfer Jesse's enrollment from Perry High School to Massillon Washington High School. I further find that the anguish demonstrated by Jesse in his mid-summer 1998 telephone call to his coach and confidant Bridgett Frantz, is one of the precise reasons by the membership of the OHSAA have adopted a zero tolerance policy when it comes to recruitment of student-athletes."
The trial court, in the case sub judice, specifically found that Commissioner Clare Muscaro's decision, given his standard of proof, was both arbitrary and mistaken and that, therefore, plaintiffs-appellees had established a likelihood or probability of success on the merits. We find that the trial court did not abuse its discretion in so finding. The issue throughout this case has been whether plaintiff-appellee Jessie Scott was improperly influenced to transfer to Massillon Washington High School in violation of OHSAA Bylaw 4-9-2. Such Bylaw prohibits the "use of influence by any person connected or not connected with the school to secure or to retain a prospective athlete." The trial court, in its August 13, 1999, Judgment Entry, found that the Scotts had reported the alleged contacts to Perry High School coaches and/or employees on at least four occasions prior to February, 1999, and that Perry High School officials had not fabricated their testimony. The trial court further found, however, that there was no independent evidence to establish that the recruiting contacts alleged did, in fact, occur and that, therefore, the Commissioner's decision was not supported by reliable evidence. As is set forth in detail above, while each of the witnesses who testified on Perry's behalf testified that they were told of the alleged contacts either by plaintiff-appellee Jessie Scott or a member of his family, not one had any direct knowledge that plaintiff-appellee Jessie Scott had, in fact, been recruited. Moreover, none of the witnesses was able to identify what was said during the alleged home visit or the alleged telephone calls or to identify the name of the callers or the specific date of the calls. For example, Coach Wakefield during the hearing, agreed that he did not know "if anybody actually contacted him [plaintiff-appellee Jessie Scott] or visited him" and that plaintiff-appellee Jessie Scott "was still just talking, he didn't name any names, anything." Transcript of OHSAA hearing at 98. In fact, the Commissioner, in his decision, admitted that the details of the phone calls and contacts to plaintiff-appellee Jessie Scott or his family was "sparse." However, what is of greater concern to this Court is the absence of competent and credible evidence in the OHSAA hearing record supporting the Commissioner's finding that plaintiff-appellee Jessie Scott, in fact, transferred to Massillon Washington High School as a result of the alleged contacts. While OHSAA Bylaw 4-9-2 contains the term "influence," no definition of such term is contained in the Bylaws. What constitutes "influence" under the Bylaws is based upon Commissioner Muscaro's discretion and judgment. Commissioner Clare Muscaro, during the hearing before the trial court, agreed that the purpose of the OHSAA hearing "was to determine whether those third party's actions actually caused Jessie to transfer" and that it was "important to have causation." Transcript of Proceedings before trial court at 144. (Emphasis added.) The Commissioner further agreed that if he determined that plaintiff-appellee Jessie Scott's decision to transfer was a voluntary family decision rather than a decision caused by illegal influence, he would not have found a violation. Therefore, we must focus our analysis on whether the trial court abused its discretion when it concluded, that the Commissioner's decision, finding plaintiff-appellee Jessie Scott had transferred because of influence, was arbitrary or mistaken. The trial court found that the Commissioner's decision was arbitrary or mistaken because it was not supported by reliable, probative and substantial evidence. See Mofu, supra. Upon review of the record of the hearing before the OHSAA and the quality of the evidence available at that hearing dealing with Jessie Scott's reasons for transferring to Massillon Washington High School, we find that the trial court did not abuse its discretion in concluding the Commissioner's decision was arbitrary or mistaken. According to Coach Wakefield `s testimony, at the OHSAA hearing, plaintiff-appellee Jessie Scott first indicated that he was being contacted by people from Massillon in January of 1998. However, it was not until plaintiff-appellee transferred approximately a year later that Coach Wakefield notified the OHSAA of the alleged recruiting violations regarding Jessie. Coach Wakefield also testified at the OHSAA hearing that he did not know the names of anyone who had committed an alleged act of influence or the specifics of what was said during the alleged acts. In fact, he agreed that he did not know if anybody actually contacted or visited plaintiff-appellee Jessie Scott. Coach Wakefield further testified that he had no knowledge that money, tuition, employment, books or anything of value was offered to plaintiff-appellee Jessie Scott or his family to influence him to transfer to Massillon. In short, not one of the Perry High School witnesses, while testifying about the alleged contacts made to influence plaintiff-appellee Jessie Scott to transfer to Massillon Washington High School, were able to identify who initiated the contact, the specific date of the contact, or specifically what was said during the contact that would influence plaintiff-appellee Jessie Scott to transfer. Moreover, the witnesses who testified at the OHSAA hearing all confirmed that the members of the Scott family were strong-willed individuals who were not easily influenced and that plaintiff-appellee Jacqueline Scott was committed to the best interest of her children. Sandy Mercorelli, the bus driver who testified at the hearing, testified that while plaintiff-appellee Jacqueline Scott told her of the alleged contacts, Mrs Scott also stated that "Jessie would never go to Massillon." Transcript of OHSAA hearing at 130. Coach Wakefield also testified that plaintiff-appellee Jacqueline Scott told him that Jessie "loved" Perry High School and Jacqueline Scott did not intend to remove her son from the same. Furthermore, the witnesses all confirmed a lack of any monetary inducement for Jessie to transfer. In contrast to the allegations that the alleged contacts actually influenced plaintiff-appellee Jessie Scott to transfer to Washington Massillon High School, all of the members of the Scott family who testified at the OHSAA hearing emphasized that the decision for Jessie to transfer was a voluntary "family decision" made after taking into account Jessie's best interests. Of utmost concern to the Scott family was Jessie's ability to get a college scholarship. Plaintiff-appellee Jessie Scott, his father, plaintiff-appellee J.C. Scott, and Jessie's brother Devon Scott, all voiced their concerns that Jessie did not receive enough exposure at Perry High School and that he would have better athletic exposure at Massillon Washington High School. Plaintiff-appellee Jessie Scott himself testified that he wanted to transfer because "Massillon does usually have more athletes get Division I scholarships from their school than Perry does. . . . I think that I would have a better opportunity at Massillon." Transcript of OHSAA hearing at 358. Plaintiff-appellee Jessie Scott also indicated that he was frustrated with Perry High School's football program and did not believe that he was being used enough. At the OHSAA hearing, Devon Scott, Jessie's brother, testified that Jessie "felt like he wasn't getting the ball enough,. . . . he felt that after he had one good week he thought he would play more the following week and he didn't, it was the same amount of playing time, so that's when he really started to show concern and, you know, dissatisfied with his situation." Transcript of OHSAA hearing at 324. The Scott family testified that the decision for Jessie to transfer was also based on Perry High School's substandard track facilities and concern over its financial situation and its ability to pass a school levy. Based on the foregoing, we find that the trial court did not abuse its discretion in finding that there was a likelihood that plaintiffs-appellees would prevail on the merits. ISSUE OF IRREPARABLE HARM As is discussed above, before an injunction is granted, a plaintiff must establish that the issuance of the injunction will prevent irreparable harm to the plaintiff. Thus, the next issue to be determined by this Court is whether the trial court abused its discretion in finding that the issuance of a preliminary injunction in the case sub judice would prevent irreparable harm to plaintiff-appellee Jessie Scott. The trial court, in its August 13, 1999, Judgment Entry, specifically stated as follows: "Jesse Scott entered Massillon Washington High School in January of 1999 pursuant to Massillon High School's open enrollment policy. At that time, the school board for Perry School District agreed to the transfer and Jessie Scott was properly enrolled. His [sic] is properly enrolled today. This matter was initiated by Perry High School officials in February of 1999. Due to the procedures established by the OHSAA, a final decision by Commissioner Muscaro was not filed until June 10, 1999. This case was filed July 9, 1999, and has moved with great dispatch since the filing of the cause of action.
Today's date is August 10, 1999, and for all practical purposes, football has begun in Stark County and classes are to begin in a matter of days. Without this Court issuing an injunction against the appropriate parties, Jessie Scott will not be permitted to engage in any interscholastic athletics while a student at Massillon Washington High School. It is the Court's opinion that his being precluded from engaging in such activities will cause irreparable harm to him, not only as a student for the calendar years 1999 and 2000, but may very well have a significant detrimental effect on this young man's ability to seek a higher education. Therefore, the Court finds that the issuance of this injunction will prevent irreparable harm to Mr. Jessie Scott."
We find that the trial court did not abuse its discretion in finding that irreparable harm to plaintiff-appellee Jessie Scott would be prevented if the preliminary injunction was issued. At the hearing before the trial court, plaintiff-appellee Jessie CScott testified that his family could not afford to send him to college if he did not get an athletic scholarship. Transcript of Proceedings before trial court at 82. When asked what would happen if he was unable to play football, plaintiff-appellee Jessie Scott, who indicated that a number of colleges had already expressed an interest in him based upon his performance, testified that "I don't think that I will get the scholarship." Transcript of Proceedings before trial court at 84. He also testified that because of "too many hard feelings between me and the people at Perry" and because of harassment by people from Perry High School, returning to his former high school was not an option. Transcript of Proceeding before trial court at 87. When asked whether he considered transferring to another school other than Massillon Washington High School and playing football there, plaintiff-appellee Jessie Scott responded as follows: B. Yes, I have thought about it. Q. What conclusion did you come to about that possible option? A. It's not an option. Q. Why is that? A. Because once again the transportation problem because I don't drive. The transportation problem would be a problem. Jackson is 15 minutes away from my house. McKinley, that could be 20.
Q. Do you know whether those schools have open enrollment policies? A. They don't have open enrollment. Q. So would you be required to pay tuition? A. Yes. Q. What about transferring to one of those schools and playing football? Did you think that was a possibility for this season? A. No. Q. Why? A. Because it's already mid-July. Everyone is already getting ready to do their thing for football season. Coaches have already got what they have planned out for the season. For me to come into a school so late in the summer I would miss the chance to learn, to get a feel for the their quarterback, for their players, and for them to get a feeling for me." Transcript of Proceedings before trial court at 88-89. Plaintiff-appellee Jessie Scott also testified that he had already missed football training because of the OHSAA's decision ruling him ineligible to play at Massillon Washington High School. Based on such testimony, we find that the trial court did not abuse its discretion in finding that plaintiff-appellee Jessie Scott's "being precluded from engaging in such activities [interscholastic athletics] will cause irreparable harm to him, not only as a student for the calendar years 1999 and 2000, but may very well have a significant detrimental effect on this young man's ability to seek a higher education." The trial court's finding was not arbitrary, unreasonable or unconscionable. Moreover previously, in Long v. Ohio High School Athletic Ass'n. (Sept. 26, 1991), Tusc. App. No. 990AP120069, unreported, we held that injunctive relief was the appropriate remedy pending judicial review of the OHSAA's disciplinary decisions. In so holding, we rejected the appellant's argument that because the appellee had no right to participate in extracurricular sports, he could not demonstrate irreparable harm from being suspended from the same. ISSUE OF INJURY TO OTHERS We must next consider whether the trial court abused its discretion in holding that the granting of the preliminary injunction would not cause injury to any other person or institution. The trial court, in its August 13, 1999, Judgment Entry, specifically stated that despite the OHSAA's concern that the granting of the preliminary injunction may undermine its authority with the remaining OHSAA member schools, the OHSAA would "survive" and would not be injured if the injunction were granted. While we are sympathetic to defendants-appellants' argument that other schools may suffer harm if Massillon Washington High School is permitted to benefit from the skills and talents of an ineligible player, we do not find that the trial court abused its discretion in finding that the injury to others does not outweigh the potential injury to plaintiff-appellee Jessie Scott. We concur with plaintiffs-appellees' argument that while no evidence was presented during the preliminary injunction hearing of harm to the OHSAA or its member schools, there was substantial evidence in the record, as is discussed above, that plaintiff-appellee Jessie Scott would suffer irreparable harm if the preliminary injunction was not granted. ISSUE OF PUBLIC INTEREST As is set forth above, the fourth requirement for the issuance of an injunction is that the public interest will be served by the granting of the injunction. The trial court, in its August 13, 1999, Judgment Entry, held that "[t]he public interest is always served when institutions take time to ensure that the rights of individuals are fully protected" and that the "public interest will be best served by permitting Mr. Jessie Scott to engage in interscholastic athletics pending the full hearing contemplated by Civ.R. 65(B)." While we recognize the OHSAA's legitimate goal of maintaining the integrity of high school athletics by prohibiting illegal recruiting, we do not find that the trial court abused its discretion in finding that the public interest would be served by granting a preliminary injunction. For the forgoing reasons, we find that the trial court did not abuse its discretion in granting plaintiffs-appellees' Motion for a Preliminary Injunction since such decision was not arbitrary, unconscionable or unreasonable. Defendants-appellants' six assignments of error are, therefore, overruled. The judgment of the Stark County Court of Common Pleas is affirmed. By Edwards, J. Hoffman, P.J. and Milligan, V. J. concurs
 JUDGMENT ENTRY
CASE NO. 1999CA00269 For the reasons stated in the Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs to appellants.