LOCAL 4501, COMMUNICATIONS WORKERS OF AMERICA, APPELLANT AND CROSS-APPELLEE, *v.*
OHIO STATE UNIVERSITY ET AL., APPELLEES AND CROSS-APPELLANTS.

[Cite as Local 4501 *v.* Ohio State Univ. (1986), 24 Ohio St. 3d 191.]

(No. 85-696—Decided July 2, 1986.)

192

*Francisco A. Garabis,* for appellant and cross-appellee.

*Anthony J. Celebrezze, Jr.,* attorney general, *Moots, Cope & Weinberger Co., L.P.A., Philip R. Moots* and *Robert M. Weinberger,* for appellees and cross-appellants.

*Anthony J. Celebrezze, Jr.,* attorney general, and *Richard A. Green,* urging affirmance for *amicus curiae,* Ohio Department of Administrative Services.

*Means, Bichimer, Burkholder & Baker Co., L.P.A., Robert T. Baker* and *Kimball H. Carey,* urging affirmance for *amicus curiae,* Ohio School Boards Association.

*Per Curiam.* The propositions of law advanced by the parties effectively can be reduced to two general issues. The first issue before the court is whether the trial court erred in permitting the university's custodial service contracts to be "performed according to their terms." C.W.A. argues that the trial court failed to abide by the "law of the case" doctrine when, on remand of the instant case, it declined to terminate the service contracts that were found by this court to have been let out in a manner that was contrary to Ohio law. We find that C.W.A.'s argument has merit.

The plain import of this court's holding in *Local 4501* v. *Ohio State Univ.* (1984), 12 Ohio St. 3d 274, is that those custodial service contracts that were let out by the university during its hiring freeze on civil service custodial personnel were contrary to law. As such, the contracts in question were *void*; and, under the "law of the case" doctrine, the trial court was obligated to comply with the mandate of this court by ordering the termination of all such contracts that were still in effect.[1] See *Nolan* v.

---

[1] Although, as noted by the court of appeals, C.W.A. "did not pray for any particular contract to be set aside," C.W.A. *did* submit a proposed order on remand that would have set

*Nolan* (1984), 11 Ohio St. 3d 1. The trial court had no authority to allow the continued performance of the unlawful service contracts and, in holding that the contracts could be "performed according to their terms," the trial court erred.

This finding of error does not resolve the instant case, but it leads us to the second issue presented herein—whether C.W.A. is entitled to an order terminating the university's *current* custodial service contracts. C.W.A. contends that the service contracts that were found to be unlawful in *Local 4501, supra,* are still being performed as a result of *pro forma* renewals of their terms. The university asserts that all of the "hiring freeze" contracts have expired and that any renewal of those contracts was lawful under the guidelines set forth in *Local 4501*. The record supports the university's assertion.

Although the service contracts that were let out during the hiring freeze on civil service custodial positions were unlawful, it is not disputed that all of those contracts were of short duration (*i.e.,* one year or less). The renewals of service contracts that are currently in effect apparently were approved by the university *subsequent* to the cancellation of the civil service hiring freeze.[2] While C.W.A. contends, in effect, that the renewals are simply extensions of the unlawful contracts and therefore void, the record does not support this contention. The university was under no obligation to renew the contracts in question, and each renewal was for a new term and supported by new consideration. As such, the "renewals" are new contracts whose legality must be determined independently from the "hiring freeze" contracts. C.W.A. has offered no independent basis to support a conclusion that the current service contracts are contrary to Ohio civil service law, and the contracts therefore may not be terminated for this reason. This determination, however, does not end our inquiry concerning the validity of the university's current service contracts.

The university urges the court to reconsider its decision in *Local 4501* and to remove the limitations announced therein, which prohibit public employers from contracting for the services of independent contractors while simultaneously enforcing a hiring freeze that depletes the ranks of civil service employees who perform the same work as the independent contractors. Upon careful consideration of the arguments presented by the parties and the *amici,* and in light of recent changes in Ohio law, we believe that our holding in *Local 4501* can be limited.

---

aside *all* of the university's unlawful custodial service contracts. This proposal was adequate to support an order terminating the contracts in question.

[2] In *Local 4501* v. *Ohio State Univ.* (case No. 85-1553), dismissed on April 16, 1986 as having been improvidently allowed, C.W.A. challenged the renewals of the university's custodial service contracts on the grounds that the university had not cancelled its hiring freeze on civil service positions at the time of the renewals. The trial court found that the university was no longer engaged in a hiring freeze and it upheld the service contracts that were then in effect. The court of appeals affirmed the judgment of the trial court.

In *Local 4501,* we focused on the absence of systemic checks upon public employers who seek to avoid the strictions and requirements of the civil service system. We noted that by creating civil service vacancies through a hiring freeze and then contracting for the services of independent contractors, "the university obtains a *free hand* to let out all services on a contract by contract basis without any moderation or restriction by the civil service system. Political activity is no longer restrained and the laudable purpose of the civil service system is sidestepped completely." (Emphasis added.) *Id.* at 276. We thus concluded that the manner of contracting for services employed by the university, if allowed to continue unchecked, would result in the dismantling of a civil service personnel system and increase the potential for the abuses in hiring and contracting that civil service merit selection was designed to prevent. This result is contrary to the policies behind Ohio's civil service law; and, although the court recognized that contracting for the services of independent contractors often contributes to the efficiency of government, we determined that, *absent a check* on public employers who are desirous of substituting independent contractors for civil servants, the need to protect the civil service outweighs any potential benefits that might accrue to a governmental entity as a result of independent service contracts.

Subsequent to the events that gave rise to our decision in *Local 4501,* the law governing the relationship between Ohio's public employers and employees was reshaped. On April 1, 1984, R.C. Chapter 4117 was enacted to establish a legal framework for public-sector labor relations. Within that framework, Ohio's public employees were granted, for the first time, the statutory right to collectively bargain with their employers over "matters pertaining to wages, hours, or terms and other conditions of employment," R.C. 4117.08(A),[3] and certain unfair labor practices were defined, R.C. 4117.11. R.C. Chapter 4117 thus provides the "check" on the power of public employers that was absent when C.W.A. first challenged the university's independent service contracts.

A public employer's practice of letting out independent service contracts, rather than filling vacant civil service positions with employees who would perform the same work as the independent contractors, is a matter that pertains to "wages, hours, or terms and other conditions of employment" and, as such, is a proper subject of collective bargaining between the public employer and the exclusive representative of an affected bargaining unit. See *Fibreboard Paper Products Corp.* v. *NLRB* (1964), 379 U.S. 203. Civil servants, themselves, are thus in a position to "protect" the civil service system at the bargaining table; and public

---

[3] Prior to the enactment of R.C. Chapter 4117, public employees had been permitted to collectively bargain with their employer only when the employer, *in its discretion,* chose to engage in such bargaining. See *Dayton Teachers Assn.* v. *Dayton Bd. of Edn.* (1975), 41 Ohio St. 2d 127 [70 O.O.2d 223]; *Assn. of Cuyahoga Cty. Teachers of Trainable Retarded* v. *Cuyahoga Cty. Bd. of Mental Retardation* (1983), 6 Ohio St. 3d 190, 193-194.

employers no longer have a "free hand" to dismantle a civil service personnel system by enforcing a hiring freeze in conjunction with the letting out of independent service contracts.

Based on the foregoing and on the difficulties inherent in the enforcement of the limitations set forth in *Local 4501*,[4] we conclude that our holding in *Local 4501* should be limited to a rare instance in which the civil service positions affected by a hiring freeze are (or may be) filled by public employees who have no statutory right to engage in collective bargaining and are not subject to a collective bargaining agreement. It can generally be stated, therefore, that in the absence of proof that a public employer was motivated by political considerations or a desire to set up a spoils system, the public employer " 'may lawfully contract to have an independent contractor perform services which might also be performed by civil service employees,' " *State, ex rel. Sigall,* v. *Aetna* (1976), 45 Ohio St. 2d 308, at 315 [74 O.O.2d 471], so long as such practice is not violative of either the affected employees' collective bargaining agreement or R.C. Chapter 4117.

The foregoing standard is applicable in determining the validity of the university's current service contracts, but we are unable to make this determination without reference to the parties' current collective bargaining agreement. The only agreement between the parties that is contained in the record of the instant case expired on August 31, 1983; and there is no evidence in the record to indicate that any of the university's current custodial service contracts were entered into prior to that date.[5] We conclude, therefore, that the university's current service contracts may be performed according to their terms unless, as a result of some other proceeding, they are found to be violative of an applicable collective bargaining agreement or otherwise contrary to law.

It is hoped that today's decision will encourage resolution of the parties' dispute without further resort to the courts. With this in mind, we reiterate that the university's manner of contracting for custodial services is a proper subject for collective bargaining, and we note that disputes of

---

[4] It is apparent that the limitations announced in *Local 4501* engender factual disputes over the question of whether a public employer "unofficially" or deceptively imposed a hiring freeze on civil service positions. See fn. 2, *supra.* It also is conceivable that *Local 4501's* limitations will engender disputes as to whether an independent contractor is performing services that would otherwise be performed by civil service employees, and whether a service contract lawfully entered prior to a hiring freeze may be renewed during the freeze.

[5] The university apparently has never acted pursuant to R.C. 124.321 to lawfully abolish any of the vacant civil service positions that are the focus of the parties' protracted dispute. C.W.A. thus contends that, by contracting out services, the university was "filling" vacant custodial positions in a manner that was contrary to the parties' former collective bargaining agreement, which expired on August 31, 1983. Because the university's current service contracts apparently were entered into after that date, this issue is moot and will not be addressed by the court.

this nature should be resolved, whenever possible, through arbitration. See *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.* (1960), 363 U.S. 574.

Accordingly, the judgment of the court of appeals is reversed in part and, for the reasons stated herein, affirmed in part.

*Judgment reversed in part*
*and affirmed in part.*

CELEBREZZE, C.J., SWEENEY, C. BROWN and WRIGHT, JJ., concur.

LOCHER, HOLMES and DOUGLAS, JJ., concur in judgment only.

WRIGHT, J., concurring. I vigorously disagree with the breadth and content of this court's previous decision in *Local 4501* v. *Ohio State Univ.* (1984), 12 Ohio St. 3d 274. I cannot disagree, however, with today's decision, which rejects the blanket prohibition that precluded every element of government from contracting out for services.

I am more than pleased that the majority has, in essence, limited *Local 4501* to its facts. The majority has breathed life back into *State, ex rel. Sigall,* v. *Aetna* (1976), 45 Ohio St. 2d 308 [74 O.O.2d 471], by citing with approval the proposition that a public employer " 'may lawfully contract to have an independent contractor perform services which might also be performed by civil service employees.' " *Id.* at 315. As was clearly demonstrated in the *amicus curiae* brief of the Ohio Department of Administrative Services, a contrary posture would have cost our taxpayers hundreds of thousands of dollars.

The Ohio Constitution imposes upon the state the duty to provide and support a number of sovereign programs. For example, the General Assembly must provide for a thorough and efficient school system, the care of the state's needy and mentally disabled, the protection of workers, and the protection of our natural resources. See Section 2, Article VI, Ohio Constitution; Section 1, Article VII, Ohio Constitution; Sections 34, 35 and 36, Article II, Ohio Constitution. The Constitution not only mandates that all these programs or services be provided, but also requires that they be provided in a cost-efficient manner. Section 3, Article VIII, and Section 4, Article XII, of the Ohio Constitution require the state to have a balanced budget at the close of each fiscal year. Our decision today promotes these mandates.

The goals and values of these constitutional requirements are certainly as compelling as the goals articulated in the civil service provisions of Section 10, Article XV of the Ohio Constitution. That section should not be elevated above other constitutional provisions that admonish state officials to maintain a balanced budget while providing important state services. The standard for contracting out that was adopted in *Local 4501* created

the certain prospect of a loss of cost-savings associated with contracting out by the state and its political subdivisions.

As today's majority has recognized, it is simply unreasonable to hold that particular services rendered by the state or an entity of local government must be performed exclusively by civil service employees.

The Ohio State University has contracted out for custodial services since 1967. Further, state and local governments in Ohio have contracted out for services, even though identical services were available from the classified service, for many years. See *Cleveland* v. *Lausche* (1943), 71 Ohio App. 273 [26 O.O. 123]. Despite court challenges to contracting for services, this practice has uniformly been upheld as long as such contracts were not the consequence of political favoritism. See, *e.g., Sigall, supra; State, ex rel. Ohio Civil Serv. Emp. Assn.,* v. *Coshocton* (1982), 5 Ohio App. 3d 5; *Sovine* v. *Teater* (1976), 47 Ohio App. 2d 254 [1 O.O.3d 146]; *Cleveland* v. *Lausche, supra.*

The General Assembly has never seen fit to enact any statute restricting public employers from contracting for outside services in favor of services provided by civil service employees, or requiring that before employers contract out they must first attempt to obtain the needed services from the civil service. Indeed, the legislature has specifically authorized contracting out by requiring competitive bidding in contracts of significant dollar amounts, R.C. 125.071, and providing for minority set-aside programs to assure that minority contractors will participate in this contracting out, R.C. 125.081.

While I certainly agree with the majority's limitation of this court's prior holding in *Local 4501,* I also must concur that the trial court did appear to ignore that previous holding.

Accordingly, I concur.