DECISION
Plaintiff-appellant, Griffin Industries, Inc., appeals from a judgment of the Franklin County Court of Common Pleas granting summary judgment for defendants-appellees Ohio Department of Administrative Services, Ohio Department of Transportation, BP Amoco Company, Direct Resources, Inc., Hightowers Petroleum Company, and Midland CO-OP, Inc.
Appellant brought this action seeking a temporary restraining order and preliminary injunctions prohibiting appellee Ohio Department of Administrative Services ("ODAS") from awarding contracts for the purchase of a variety of alternative diesel fuel known as "B20" pursuant to an invitation to bid ("ITB") issued by ODAS on February 4, 2000. Appellee Ohio Department of Transportation ("ODOT") was granted leave to intervene as a party defendant in the case. The remaining defendants are fuel suppliers awarded contracts pursuant to a second ITB issued May 29, 2000, which replaced the earlier February 4, 2000 ITB. Appellant amended its complaint during the course of the action to reflect the later ITB and add the successful bidders as defendants.
The bio-diesel fuel specified as a component of B20 is an alternative to standard diesel fuel produced from petroleum, and may be produced from virgin or recycled vegetable oil and animal fat. The ITB issued by ODAS specified that the bio-diesel portion of the B20 must be derived from virgin soy bean oil only. It is undisputed that appellant's product, which is derived from recycled waste fryer oil, does not comply with the virgin soy oil requirement of the ITB, and that appellant never formally bid on the contracts.
The basis for appellant's claim was that the bio-diesel ITB, and any contracts entered into thereunder, were unlawful because the bid specifications requiring virgin soy bean oil were violative of R.C. 125.082
and Ohio Adm. Code 123:5-1-09(B), governing the purchase of recycled products by the state and providing in pertinent part as follows:
 (A) When purchasing equipment, materials, or supplies, the general assembly; the offices of all elected state officers; all departments, boards, offices, commissions, agencies, institutions, including, without limitations, state-supported institutions of higher education, and other instrumentalities of this state; the supreme court; all courts of appeals; and all courts of common pleas, may purchase recycled products in accordance with the guidelines adopted under division (B) of this section if the products are available and meet the performance specifications of the procuring entities. Purchases of recycled products shall comply with any rules adopted under division (C) of this section.
 (B) The director of administrative services shall adopt rules in accordance with Chapter 119. of the Revised Code establishing guidelines for the procurement of recycled products pursuant to division (A) of this section. To the extent practicable, the guidelines shall do all of the following:
 (1) Be consistent with and substantially equivalent to any relevant regulations adopted by the administrator of the United States environmental protection agency pursuant to the "Resource Conservation and Recovery Act of 1976," 90 Stat. 2806, 42 U.S.C.A. 6921, as amended;
 (2) Establish the minimum percentage of recycled materials the various products shall contain in order to be considered "recycled" for the purposes of division (A) of this section;
 (3) So far as practicable and economically feasible, incorporate specifications for recycled-content materials to promote the use and purchase of recycled products by state agencies.
 (C) The director may adopt rules in accordance with Chapter 119. of the Revised Code establishing a maximum percentage by which the cost of recycled products purchased under division (A) of this section may exceed the cost of comparable products made of virgin materials. [R.C. 125.082.]
 (A) When purchasing equipment, materials, or supplies, the general assembly; the offices of all elected state officers; all departments, boards, offices, commissions, agencies, institutions, including, without limitation, state-supported institutions of higher education, and other instrumentalities of this state; the supreme court; all courts of appeals; and all courts of common pleas, may purchase recycled products when:
 (1) The recycled product being offered is substantially equivalent to the non-recycled product and is commercially available in quantities sufficient to meet the needs of the procuring agency;
 (2) The recycled product being offered is consistent with and substantially equivalent to any relevant regulations adopted by the administrator of the United States environmental protection agency pursuant to the "Resource Conservation and Recovery Act of 1976," 90 Stat. 2806, 42 U.S.C.A. 6921, as amended;
 (3) It is economically feasible to purchase the recycled product. To determine if the product is economically feasible, the purchasing entity may apply a preference not to exceed five percent above the lowest price offered for the comparable non-recycled product being considered.
 (B) So far as practicable and economically feasible, specifications shall:
(1) Omit virgin only material requirements;
 (2) Include the minimum percentage of recycled materials the various products shall contain to be considered recycled;
 (3) Include functional or performance criteria permitting use of recycled content materials and supplies. [Ohio Adm. Code 123:5-1-09.]
ODAS (and subsequently BP Amoco Company) moved for summary judgment. In an oral decision rendered from the bench, the trial court granted summary judgment for ODAS on a variety of grounds. The trial court first found that appellant lacked standing to bring the action. The trial court also found that appellant could not obtain equitable relief in the form of an injunction because appellant had a legal remedy in the form of an action for monetary damages in the Ohio Court of Claims. Finally, the trial court found that the ITB complied with statutory and regulatory requirements because, in the absence of extensive testing of bio-diesel fuel derived from waste fryer oil, the requirements of Ohio Adm. Code123:5-1-09 governing the use of recycled materials had not been met. The court noted that, in contrast to the untested nature of appellant's product, the state had undertaken a thorough and detailed inquiry into the feasibility of bio-diesel fuel derived from virgin soy oil and found this fuel to be satisfactory. The court subsequently entered a judgment entry reflecting its decision, and additionally granted summary judgment for all remaining defendants on the basis that appellant's claims against them were entirely dependent upon appellant's claim against ODAS.
Appellant has timely appealed and brings the following assignment of error:
 The trial court erred to the prejudice of Plaintiff-Appellant when it granted the motion for summary judgment of Defendant Ohio Department of Administrative Services [.]
Initially, we note that this matter was decided on summary judgment. Pursuant to Civ.R. 56(C), summary judgment may be granted only when the trial court determines that there remains no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to but one conclusion, that conclusion being adverse to the party opposing the motion. Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64. Upon appeal, our review of summary judgment is de novo. Koos v. Cent. Ohio Cellular, Inc. (1994),94 Ohio App.3d 579, 588. We thus conduct an independent review of the record without deference to the conclusions of the trial court. Jones v. Shelly Co. (1995), 106 Ohio App.3d 440, 445.
We first address the threshold issue of standing in this matter. Throughout this action, appellant has alleged standing on the basis that, as a taxpayer of the state of Ohio, it may sue on its own behalf and on behalf of all taxpayers to enjoin the state from entering into or performing an unlawful contract involving expenditures from the general fund. Appellant has not alleged standing to sue on the more limited basis of standing as an unsuccessful bidder (or in this instance, non-bidder) for the specific contracts at issue.
Taxpayer standing under these conditions is governed by the first syllabus of State ex rel. Masterson v. Ohio State Racing Comm. (1954),162 Ohio St. 366:
 In the absence of statutory authority, a taxpayer lacks legal capacity to institute an action to enjoin the expenditure of public funds unless he has some special interest therein by reason of which his own property rights are placed in jeopardy.
This court has interpreted Masterson to hold that, when an expenditure from the state's general revenue fund is questioned, a party's status as a taxpayer, independent of any other particular concern with the expenditure involved, will meet the "special interest" requirement of Masterson.
 * * * Because there is no special fund involved here as in Masterson, but, instead, only the state's general revenue fund to which plaintiff contributed as a taxpayer, plaintiff met the special interest requirements of Masterson. * * *
State ex rel. United Magill Corp. v. Hamilton (1983), 11 Ohio App. 3
. 102, 103. We have similarly held in more recent cases:
 * * * In a situation that does not involve a special fund and which only involves the state's general revenue fund, the taxpayer will meet the special interest requirement of Masterson [for standing] by demonstrating that he, as a taxpayer, has contributed to the general fund. * * *
State ex rel. Paul v. Ohio State Racing Comm. (1989), 60 Ohio App.3d 112,115.
 In the present case, plaintiffs' complaint alleged that the commission will amortize the debt created by the issuance of the bonds by the payment of rent, and that such rent will come from the general revenue fund of the state to which plaintiffs, as taxpayers, contribute. Based upon this court's holding in United Mcgill, we conclude that plaintiffs have standing to bring the present action.
Corbett v. Ohio Bldg. Auth. (1993), 86 Ohio App.3d 44, 49.
Appellees in the present case do not dispute that the state's purchases of B20 bio-diesel fuel pursuant to the ITB would be made with general tax revenues, rather than bond proceeds or other "special funds." Nor do appellees dispute that appellant is an Ohio taxpayer. On these uncontroverted facts, pursuant to the aforementioned authorities, we find that appellant, as a tax paying contributor to the state's general fund, has standing to bring the present action. To the extent that the trial court's judgment held otherwise, therefore, it was in error.
We now turn to ODAS's contention, which was accepted by the trial court, that equitable relief in the form of an injunction is not available to appellant, whose sole remedy would be an action for monetary damages in the Ohio Court of Claims. ODAS presented no persuasive authority to support this proposition before the trial court and, in fact, did not attempt to defend this proposition upon appeal; this is to counsel's credit, as the position is untenable. Clearly, monetary damages would be a difficult, if not impossible, remedy to apply in the case of a taxpayer seeking to enjoin an improper expenditure from the general fund, and an injunction has long been held the appropriate remedy:
 "Even in the absence of legislation, a taxpayer has a right to call upon a court of equity to interfere to prevent the consummation of a wrong such as occurs when public officers attempt to make an illegal expenditure of public money, or create an illegal debt * * *." [Masterson at 368.]
Green v. State Civil Serv. Comm. (1914), 90 Ohio St. 252; Ohio Valley Mall Co. v. Wray (1995), 104 Ohio App.3d 629; United Magill, supra. We accordingly find that to the extent the trial court based its judgment in favor of appellees on the unavailability of an injunction as a remedy, this was error.
We now turn to ODAS's contention that, the contracts having been awarded and in force for a significant period of time, this appeal has become moot. We find that it is not. Appellant's complaint demands an injunction against performance of the bio-diesel contracts, not merely against their award. State contracts awarded under conditions contrary to law are void and unenforceable. Local 4501 v. Ohio State Univ. (1986),24 Ohio St.3d 191 . The case before us is therefore distinguishable from that in Armstrong/Mahan Joint Venture v. Ohio Dept. Admin. Serv. (Mar. 18, 1993), Franklin App. No. 92AP-970, unreported, in which we held that completed contracts might render moot an action brought to enjoin their completion. We accordingly find that the appeal before us is not moot and may be maintained, since the contracts have yet to be completed.
Having disposed of these preliminary issues of standing, availability of injunctive relief, and mootness, we turn to the substance of appellant's appeal: whether the bid specifications of the bio-diesel ITB violated R.C. 125.082 and Ohio Adm. Code 123:5-1-09, in that they specified that the bio-diesel fuel be derived from "virgin soy bean oil only," and specifically excluded waste fryer oil.
It is undisputed that ODAS has broad discretion in formulating bid specifications and awarding contracts. Malloy v. Westlake (1977),52 Ohio St.2d 103. That discretion, however, is not unlimited, but may be circumscribed by statute. Leaseway Distribution Centers, Inc. v. Ohio Dept. of Adm. Serv. (1988), 49 Ohio App.3d 99, 103. Both R.C. 125.082 and the regulatory section promulgated pursuant to it, Ohio Adm. Code123:5-1-09, provide that state agencies "may purchase recycled products." The initial sections of both the statute and rule are therefore permissive, rather than mandatory, and place ODAS under no compulsion to purchase recycled products. Ohio Adm. Code 123:5-1-09, however, goes on to state:
 (B) So far as practicable and economically feasible, specifications shall:
(1) Omit virgin only material requirements;
* * *
 (3) Include functional or performance criteria permitting use of recycled content materials and supplies. [Emphasis added.]
This reflects the statutory language found in R.C. 125.082(B) requiring that:
 The director of the administrative services shall adopt rules * * * establishing guidelines for the procurement of recycled products * * *. To the extent practicable, the guidelines shall do all of the following:
* * *
 (3) So far as practicable and economically feasible, incorporate specifications for recycled-content materials to promote the use and purchase of recycled products by state agencies. [Emphasis added.]
It is therefore apparent from the language of both statute and rule that, while nothing mandates the use of recycled products in state purchasing, the applicable regulations do mandate omission of virgin-only specifications in state purchasing unless certain conditions are met.
The question in the present case becomes, therefore, whether the inclusion of the "virgin soy bean oil only" specification, and specific exclusion of recycled waste fryer oil, from the bio-diesel ITB is based on the practical and economic unfeasibility of framing the bid specifications for bio-diesel fuel to include both virgin soy bean oil and recycled waste fryer oil based product.
The record contains a fair quantity of evidence addressing feasibility of including recycled waste fryer oil as a bio-diesel component. Appellees rely extensively on the "untested" nature of appellant's waste fryer oil bio-diesel product, and the fact that, conversely, virgin soy-based bio-diesel was subjected to exhaustive testing in a three-year "demonstration" conducted in ODOT vehicles operating in Fulton and Williams counties. The full report of this "demonstration," which is contained in the record, was compiled with the participation of ODOT, the Ohio Soy Bean Council, and Batelle Memorial Institute in Columbus, Ohio. The report summarizes and analyzes data collected reflecting operational and reliability records for five dump truck/snow plow vehicles in each county, reflecting vehicle performance, emissions, maintenance and fuel dispensing criteria. The report is generally favorable regarding the viability of using bio-diesel blends in heavy-duty diesel-powered state vehicles, but does reflect some concerns on the mixing and maintenance of consistent on-site fuel blends, as the bio-diesel appears to have a tendency to separate in storage tanks or at blending, giving rise to uneven proportions of soy-based and petroleum-based components when dispensing the bio-diesel blend. For purposes of this case, we need not undertake an overly technical analysis of the information, but a principle point of concern with the bio-diesel, as with all diesel fuels, is the tendency to precipitate solid components at colder temperatures, leading to filter clogging and poor performance. On higher proportion bio-diesel blends, where the proportion of soy-based products exceeded twenty percent, significant filter clogging appears to have occurred due to variations in "cloud point," the temperature at which certain fuel components begin to solidify.
Appellees rely heavily on this cloud point characteristic of appellant's proposed bio-diesel blend, pointing out that the bio-diesel product based on waste fryer oil might have a differing cloud point, and consequently poor cold weather performance.
An examination of the deposition testimony in this case reveals that there remains, at the very least, a material issue of fact on this question. The testimony of Brad Albin, Vice President of Operations for Griffin, was as follows regarding variations in cloud point in his product, and differentiation between bio-diesel produced from different stock than general:
 Q. Do you have any active plans to produce biodiesel from any other feedstocks at this point?
 Because I'll tell you why I asked. A couple times you said currently —
 A. We can — this plant — and one of the reasons we bought this particular technology, is we have the ability — it is the highest technology plant on the face of the earth when it comes to biodiesel. We have the ability to manufacture biodiesel from any feedstock, any oil that you can think of.
 So if markets were to change, if tallow prices were to drop, if we were to get a great big deal on some soy oil out there, if we were to get a great bid deal on rapeseed oil, fish oil, whatever that oil would be, we could make a quality biodiesel out of that to meet specifications.
 Q. So there's no active plans right now, but you're saying you're flexible in case some condition would change, you could change your feedstock?
A. Correct.
 Q. Briefly, back to the web site, and I think your testimony was that the web site reflected that the cloud point of your product was five degrees Celsius, and you used the term typical. I just wanted to know what you meant by the phrase typical.
 A. Here's one of the bottom lines on all of this: Typical — you know, I could find soy biodiesels that don't meet that cloud. I can make soy have an incredibly high cloud point, I can have it make an incredibly low cloud point. It's chemistry.
 You can take these molecules and with different chemistries, change these around and pretty much do whatever you want to to meet a specification.
 So typical is just trying to throw something out there to the world that says this is typical. So that's all that it means. [Tr. at 90-92.]
In addition to this deposition testimony from appellant's representative, the depositions of an ODOT employee and the state's own projected expert witness raised questions about the virgin-only specification in the bio-diesel ITB. The ODOT employee, Timothy Wald, testified that any material variation between bio-diesel fuels produced from different raw materials, recycled or not, would be the result of different manufacturing processes and objectives, and not dependent upon the underlying source material used to produce the fuel. (Wald depo. at 114-115, 118-119.) Norm Malcosky, an employee of Batelle Memorial Institute, which participated in the bio-diesel fuel testing program on state vehicles, stated that provided American Standards for Testing and Materials specifications were met, and the manufacturing process adapted to achieve a particular cloud point, bio-diesel blends made from recycled material would have performed the same in the ODOT/Batelle "demonstration" as any produced from virgin soy bean oil. (Malcosky depo. at 36-38.)
In the face of all the above evidence in the record asserting the comparative interchangeability of recycled and virgin material-based bio-diesel, the trial court's grant of summary judgment appears to have been based principally upon an affidavit of ODOT employee Marc Gnatowski, averring that the exclusion of bio-diesel derived from recycled material in the ITB was based upon a strict policy that ODOT will not purchase alternative fuels without preliminary testing. We will initially note that there is conflicting evidence in the record on whether or not such a policy actually existed, and that Mr. Gnatowski's affidavit is not entirely consistent with his deposition testimony. The testimony elsewhere in the record tends to indicate that ODOT has purchased and used recycled motor oil, recycled hydraulic oil, and ethanol without specifically testing the recycled components, yet never excluded ethanol produced from recycled material in its bid specifications. Even if a strict policy of prior testing were in place prior to employment of recycled fuels, however, in the present case there is sufficient evidence in the record to raise a material issue of the fact as to whether separate testing for bio-diesel derived from waste fryer oil would even be necessary. In view of the above-cited testimony asserting that variation in source materials will not materially effect the final bio-diesel product, the necessity of preliminary testing before employing bio-diesel manufactured from waste fryer oil or other recycled materials is still subject to factual dispute in this case.
Based upon the foregoing, we find that there remains a material issue of fact in the present case on the question of whether the "virgin soy oil" specification in the bio-diesel ITB complied with the mandatory language of Ohio Adm. Code 123:5-1-09 that such "virgin only material" requirements be included only where recycled materials are not "practicable and economically feasible."
In summary, we find that appellant had standing to bring this action; that the matter has not been rendered moot in the interim; that an injunction was the appropriate remedy if merited; and that there remains a material issue of fact as to whether the ITB for bio-diesel fuel complied with applicable statutes and regulations. Appellant's assignment of error is therefore sustained, and the judgment of the Franklin County Court of Common Pleas granting summary judgment to appellees is reversed.
 _____________________ DESHLER, J.
BROWN and KENNEDY, JJ., concur.