CORBETT et al., Appellants,

v.

OHIO BUILDING AUTHORITY et al., Appellees.

[Cite as *Corbett v. Ohio Bldg. Auth.* (1993), 86 Ohio App.3d 44.]

Court of Appeals of Ohio,
Franklin County.

No. 92AP–1655.

Decided Jan. 29, 1993.

*Lloyd & Weissenberger, John A. Lloyd, Jr.,* and *Jeanette H. Rost,* for appellants.

*Calfee, Halter & Griswold* and *Stanley J. Dobrowski*, for appellee Ohio Building Authority.

*Lee Fisher*, Attorney General, *Chester T. Lyman, Jr.* and *Marc A. Sigal*, Assistant Attorneys General, for appellee Ohio Arts Facilities Commission.

*Sharon J. Zealey*, for the state of Ohio.

*Squire, Sanders & Dempsey, Stephen P. Grassbaugh* and *Donald W. Wiper, Jr.*, for *amicus curiae* The Ohio Company.

DESHLER, Judge.

This is an appeal by plaintiffs, Patricia Corbett, Barbara Wolf, Oliver Bailey, Charles Fleischmann III, Stuart Jacobs and James B. Selonick, from a judgment of the Franklin County Court of Common Pleas, denying plaintiffs' request for injunctive relief and dismissing their complaint.

Plaintiffs are Ohio residents and taxpayers who have brought this action challenging the issuance of bonds and the expenditure of funds by defendant, Ohio Building Authority ("OBA"), for the financing and construction of a proposed arts facility in Cincinnati, designated as the "Cincinnati Performing Arts Center." Plaintiffs' basic contention is that the construction of the proposed arts facility, to be financed by the state through the issuance of capital improvement bonds by OBA, violates Section 2i, Article VIII of the Ohio Constitution because the facility is not a capital improvement for "housing of branches and agencies of state government" within the contemplation of that constitutional provision.

The essential facts in this action are not in dispute and were submitted to the trial court by stipulation of the parties. In 1968, the voters of the state of Ohio approved a constitutional amendment which became Section 2i, Article VIII of the Ohio Constitution. Under that amendment, the General Assembly was permitted to authorize the sale of revenue bonds for certain specified capital improvements.

In 1988, the Ohio General Assembly adopted R.C. Chapter 3383, thereby creating the Ohio Arts Facilities Commission (hereinafter "commission"). The commission is a state agency [1] whose stated purpose is to " * * * engage in and provide for the development, performance, and presentation of the arts in this state by the exercise of its powers under this chapter * * *." R.C. 3383.02(A).

---

1. R.C. 3383.02(A) provides that "[t]he commission is a body corporate and politic, an agency of state government and an instrumentality of the state, performing essential governmental functions of this state."

On March 20, 1990, the General Assembly enacted Am.Sub.H.B. No. 808, Section 16, which authorized OBA to issue obligations in an amount not to exceed $40,000,000 to pay the costs associated with the construction of the capital project designated as the "Cincinnati Performing Arts Center." On August 1, 1991, the commission and OBA entered into an agreement concerning the proposed arts facility, as required by Am.Sub.H.B. No. 808, Section 16.[2] The commission also entered into a management agreement with the Ohio Center for the Arts, a nonprofit Ohio corporation. The Ohio Center for the Arts was later merged with the Cincinnati Music Hall Association and renamed the "Cincinnati Association for the Performing Arts" ("CAPA").

On November 27, 1991, OBA, the commission, CAPA and the city of Cincinnati entered into a contract for the sale of land for redevelopment. Under the terms of the agreement, the property for the proposed project was to be acquired by Cincinnati and then conveyed by deed to the commission for a nominal fee. Pursuant to the August 1, 1991 contract between OBA and the commission, the commission was to lease the property to OBA, and then the property was to be leased back to the commission to retire the revenue bonds issued to pay for construction of the project.

To finance the construction of the project, OBA initially issued a series of notes, dated August 1, 1991, in the amount of $5,000,000 which had a maturity date of April 13, 1992. A second series of notes in the amount of $5,000,000 was subsequently issued with a maturity date of April 9, 1993.

On October 13, 1992, plaintiffs filed a complaint with the trial court against OBA, seeking a permanent injunction prohibiting the issuance of bonds and the expenditure of funds by OBA for the financing and construction of the proposed arts facility. The complaint averred that plaintiffs are taxpayers of the state of Ohio who bring this action for themselves and as representatives of a class of persons similarly situated.

In addition to plaintiffs' complaint for permanent injunctive relief, plaintiffs also filed motions for a preliminary injunction and for an order temporarily restraining OBA from proceeding to issue bonds or expend funds from the sale of proceeds of bonds toward the development or construction of the arts facility. By decision and entry dated October 14, 1992, the trial court overruled plaintiffs' motion for a temporary restraining order.

---

2. Am.Sub.H.B. No. 808, Section 16 provides in part that "[n]o obligations shall be issued until the Ohio Arts Facilities Commission provides the Ohio Building Authority with an agreement providing for all conditions of this paragraph."

On October 19, 1992, OBA filed a motion to dismiss pursuant to Civ.R. 7. On October 22, 1992, plaintiffs filed an amended complaint, naming the commission as a new-party defendant.

On November 6, 1992, a hearing was held before the trial court. At the hearing, the issue as framed by plaintiffs was whether the proposed facility could be deemed to be a building to house an agency of state government under Section 2i, Article VIII of the Ohio Constitution. The matter was submitted for decision by the court on the parties' briefs.

By decision and entry dated November 25, 1992, the trial court overruled plaintiffs' request for preliminary and permanent injunctive relief and ordered the dismissal of plaintiffs' complaint. The court concluded that pursuant to Section 2i, Article VIII of the Ohio Constitution, and in conjunction with other enabling legislation, the issuance of the bonds in this matter was constitutionally proper. The decision and entry of the trial court noted that " * * * even if the building is not to be entirely occupied by the Commission or other state agency * * *, [OBA] is empowered to issue revenue bonds for the purposes which are the subject of the within action."

On November 30, 1992, plaintiffs filed a motion with the trial court for an injunction pending appeal. The trial court denied plaintiffs' motion.

On appeal, plaintiffs assert the following assignment of error:

"The Court Of Common Pleas Erred In Failing To Enjoin The Issuance Of Revenue Bonds By The Ohio Building Authority To Finance The Construction Of The Ohio Center For The Arts—Cincinnati As Violative Of Article VIII, Section 2i, Of The Ohio Constitution."

We note that on December 28, 1992, The Ohio Company filed a motion with this court for an order granting leave to file an *amicus curiae* brief in opposition to plaintiffs' appeal. By judgment entry dated December 29, 1992, this court granted the motion.

We first address the argument raised by OBA that plaintiffs lack standing to bring the present action from which they appeal.

In *State ex rel. Masterson v. Ohio State Racing Comm.* (1954), 162 Ohio St. 366, 55 O.O. 215, 123 N.E.2d 1, paragraph one of the syllabus, the Ohio Supreme Court held:

"In the absence of statutory authority, a taxpayer lacks legal capacity to institute an action to enjoin the expenditure of public funds unless he has some special interest therein by reason of which his own property rights are placed in jeopardy."

In support of their contention that plaintiffs lack standing to bring the present action, OBA relies upon this court's opinion in *Andrews v. Ohio Bldg. Auth.* (1975), 74 O.O.2d 184. In *Andrews,* the majority held that a general taxpayer lacked the requisite special interest, enunciated in *Masterson,* to maintain an action to enjoin an alleged illegal expenditure of general revenue funds by OBA for the construction of a building project. However, in *State ex rel. United McGill Corp. v. Hamilton* (1983), 11 Ohio App.3d 102, 11 OBR 155, 463 N.E.2d 405, this court rejected the majority rationale in *Andrews.* In *United McGill,* this court adopted the reasoning set forth in Judge McCormac's dissenting opinion in *Andrews,* in holding that where a plaintiff who is challenging an expenditure from the state's general revenue fund shows that he or she contributed to that fund as a taxpayer, a special interest is shown which is sufficient to meet the special interest requirements of *Masterson.*

In the present case, plaintiffs' complaint alleged that the commission will amortize the debt created by the issuance of the bonds by the payment of rent, and that such rent will come from the general revenue fund of the state to which plaintiffs, as taxpayers, contribute. Based upon this court's holding in *United McGill,* we conclude that plaintiffs have standing to bring the present action.

The narrow issue before this court is whether the trial court erred in denying plaintiffs' request for injunctive relief based upon the court's determination that issuance of revenue bonds for the proposed arts facility would not be violative of Section 2i, Article VIII of the Ohio Constitution.

In general, courts will consider the following factors in deciding whether to grant injunctive relief: (1) the likelihood or probability of a plaintiff's success on the merits; (2) whether the issuance of the injunction will prevent irreparable harm to the plaintiff; (3) what injury to others will be caused by the granting of the injunction; and (4) whether the public interest will be served by the granting of the injunction. *In re DeLorean Motor Co.* (C.A. 6, 1985), 755 F.2d 1223, 1228. The issue whether to grant or deny an injunction is a matter solely within the discretion of the trial court and a reviewing court will not disturb the judgment of the trial court in the absence of a clear abuse of discretion. *Garono v. State* (1988), 37 Ohio St.3d 171, 173, 524 N.E.2d 496, 498.

An enactment by the General Assembly, such as the authorization for the issuance of revenue obligations at issue in the present case, is presumed to be constitutional, and a court may not declare it unconstitutional unless it is shown beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible. *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus.

The first paragraph of Section 2i, Article VIII of the Ohio Constitution provides:

"In addition to the authorization otherwise contained in Article VIII of the Ohio Constitution, the general assembly, in accordance with but subject to the limitations of this section, may authorize the issuance of obligations, including bonds and notes, of the state or of state institutions, boards, commissions, authorities, or other state agencies or instrumentalities for any one or more of the following public capital improvements: * * * the acquisition, construction, reconstruction, or other improvement of, and provision of equipment for, buildings, structures, or other improvements, and necessary planning and engineering, for water pollution control and abatement, * * * water management, * * * state supported or assisted institutions of higher education, technical education, vocational education, juvenile correction, training and rehabilitation, parks and recreation, research and development with respect to transportation, highways and highway transportation, mental hygiene and retardation, police and fire training, airports, and *other state buildings and structures,* and the acquisition and improvement of real estate and interests therein required with respect to the foregoing * * *. It is hereby determined that such capital improvements will directly or indirectly create jobs, enhance employment opportunities, and improve the economic welfare of the people of the state." (Emphasis added.)

The fifth paragraph of Section 2i, Article VIII of the Ohio Constitution provides:

"The general assembly also may authorize the issuance of revenue obligations and other obligations, the owners or holders of which are not given the right to have excises or taxes levied by the general assembly for the payment of principal thereof or interest thereon, for *such capital improvements* for mental hygiene and retardation, parks and recreation, state supported and state assisted institutions of higher education, including those for technical education, water pollution control and abatement, water management, and *housing of branches and agencies of state government* * * *." (Emphasis added.)

█ Pursuant to the provisions of the first paragraph of Section 2i, Article VIII, the General Assembly is authorized to issue obligations, including bonds and notes, for certain capital improvements, including the acquisition and construction of state buildings and structures.[3] Paragraph five of Section 2i, Article VIII authorizes the issuance of revenue obligations for "such capital improvements" (*i.e.,* certain capital improvements enumerated in paragraph one) which

---

3. The second paragraph of Section 2i, Article VIII provides that some of the capital improvements in this section may be financed by the issuance of tax supported obligations, *i.e.,* obligations for which the full faith and credit of the state is pledged. Paragraphs two, three and four set forth limitations on the issuance of tax-supported obligations.

include the "housing of branches and agencies of state government." Thus, under the constitutional provisions at issue, the General Assembly is authorized to issue revenue bonds for the "acquisition, construction, reconstruction, or other improvements of, and provision of equipment for * * * state buildings and structures * * * for * * * housing of branches and agencies of state government."

Plaintiffs assert that the authorization of revenue obligations under Section 2i, Article VIII is inapplicable to the project at issue because neither the commission nor any other state agency will be "housed" in the arts facility.[4] Plaintiffs' interpretation of "housing" would apparently limit the issuance of revenue bonds for capital improvements for "offices" of a branch or agency of state government. Thus, plaintiffs contend that because the proposed project is not an office building for the commission, the facility does not constitute a capital improvement for "housing of branches and agencies of state government" within the meaning of the Constitution.

We cannot conclude that the word "housing" is to be given the narrow construction advanced by plaintiffs. The word "housing" is defined as "any shelter, lodging, or dwelling place." The Random House Dictionary of the English Language (2 Ed.1987) 928. The verb form of "house" is defined in the following manner: "to give shelter to; harbor; lodge * * * to provide with a place to work, study, or the like * * * to provide storage space for * * *." *Id.* at 927. Common usage of the words "housing" and "house" connotes more than just a building (*i.e.*, office) to shelter people; rather, as contended by defendants and *amicus curiae*, common usage reasonably includes the housing of equipment or functions.

Pursuant to R.C. 3383.02(A), the stated functions of the commission in providing for the development, performance and presentation of the arts include "the provision, operation, and management of Ohio arts facilities."[5] R.C. 3383.03(C) provides that it is the duty of the commission to "[u]se, and provide for the use of, Ohio arts facilities for the commission's purposes * * *." Pursuant to the

---

**4.** We note that the record in this case is not clear whether office space in the proposed project is contemplated for the commission. The stipulated facts indicate that two percent of the allocated floor space is intended for "administrative space" and approximately twelve percent is intended for "a gift shop, lobby and additional gallery space, as well as for other uses not yet determined."

**5.** R.C. 3383.01(F)(2) provides that "Ohio arts facility" means:

"Any new capital facility in this state the construction of which is authorized or funded by the general assembly pursuant to division (C)(3) of section 3383.07 of the Revised Code, owned by the state and managed directly by, or by contract with, the Ohio arts facilities commission, and used for or in connection with the activities of the commission, including the presentation of arts to the public."

powers set forth in R.C. 3383.04(C), the commission may "[o]wn, lease, equip, furnish, administer, and manage Ohio arts facilities."

Based upon the common meaning of the word "housing," we conclude that the phrase "housing of branches and agencies of state government" reasonably encompasses the above functions of the commission. As noted by *amicus curiae*, under the interpretation suggested by plaintiffs, revenue bonds which could conceivably be issued to construct an office building for an agency such as the Department of Transportation could not be issued to construct facilities to house the equipment and supplies of that agency. We find it unreasonable to conclude that either the drafters of the constitutional amendment or the voters who ratified it intended such an application.

Although not controlling, we are aided by R.C. 152.09(F), an enactment of the General Assembly in 1982 concerning the issuance of obligations under Section 2i, Article VIII for capital facilities.[6] In general, a legislative construction of a constitutional provision is entitled to serious consideration by the courts. *State ex rel. Mack v. Guckenberger* (1942), 139 Ohio St. 273, 282, 22 O.O. 311, 315, 39 N.E.2d 840, 845. However, it is ultimately the role of the judiciary, rather than the General Assembly, to interpret the Constitution of the state. *Lucas v. Lucas Local School Dist.* (1982), 2 Ohio St.3d 13, 15, 2 OBR 501, 502, 442 N.E.2d 449, 451.

R.C. 152.09(F) provides:

"The [Ohio building] authority is authorized to issue revenue obligations and other obligations under Section 2i of Article VIII, Ohio Constitution, for the purpose of paying the cost of capital facilities for housing of branches and agencies of state government, including capital facilities for the purpose of housing personnel, equipment, or functions, or any combination thereof that the state agencies are responsible for housing * * *."

Thus, pursuant to R.C. 152.09(F), the General Assembly has determined that the issuance of obligations for capital facilities for "housing of branches and agencies of state government" includes housing "personnel, equipment, or functions" for which state agencies are responsible.

It is well settled that "[e]very reasonable presumption must be indulged in favor of the constitutionality of a statute and it is the duty of the courts to

---

6. Pursuant to R.C. 152.09(A)(4), "capital facilities" means:

"[B]uildings, structures, and other improvements, and equipment, real estate, and interests in real estate therefor, within the state, and any one, part of, or combination of the foregoing, for housing of branches and agencies of state government, including capital facilities for the purpose of housing personnel, equipment, or functions, or any combination thereof that the state agencies are responsible for housing, for which the Ohio building authority is authorized to issue obligations pursuant to Chapter 152. of the Revised Code * * *."

construe statutes liberally, in order to save them from constitutional infirmities." *Guckenberger, supra,* 139 Ohio St. at 277, 22 O.O. at 313, 39 N.E.2d at 843. Further, "[a]s between two possible interpretations of a statute, one unconstitutional and the other valid, it is the duty of the court to adopt that which will save the act." *Id.* Based upon the common usage of "housing," discussed above, we find the legislature's interpretation of "housing" under R.C. 152.09(F) to be reasonable and not in conflict with Section 2i, Article VIII of the Ohio Constitution.[7]

Plaintiffs also argue that it is evident that the voters of Ohio intended to limit the power of the General Assembly to authorize the issuance of revenue bonds for projects such as the facility at issue based upon the voters' rejection of a prior constitutional amendment. More specifically, plaintiffs point out that in 1967, the voters rejected a constitutional amendment which included a provision authorizing the issuance and sale of revenue bonds. Plaintiffs contend that the rejection of the 1967 amendment, and the subsequent adoption of Section 2i, Article VIII in 1968, demonstrated a clear intention on the part of voters to change the "system" and to dictate to the General Assembly the limited purposes for which revenue bonds may be used.

We are unpersuaded. An examination of the proposed constitutional amendment of 1967 reveals that the provision concerning the authorization to issue revenue bonds constituted a minor portion of the amendment. In addition to the provision regarding revenue bonds, the amendment contained authorization for a number of tax supported obligations. Further, the proposed amendment expanded the purposes for which tax-supported obligations could be issued and increased the amount of such obligations which could be issued. Given the various obligations contained in the proposed constitutional amendment of 1967, we find it speculative at best to conjecture why the voters may have chosen to reject the amendment at that time. In sum, the mere fact that Ohio voters rejected the 1967 amendment does not present clear and convincing extrinsic evidence regarding the intent of the voters with respect to the proposed provision for revenue obligations.

In light of the foregoing, we find that the trial court did not err in failing to enjoin the issuance of the revenue bonds by OBA based upon its determination

---

7. Plaintiffs further contend, based upon their interpretation of the phrase "housing of branches and agencies of government," that the maxim *"expressio unius est exclusio alterius"* should be utilized by this court to hold that the fifth paragraph of Section 2i, Article VIII of the Ohio Constitution does not provide for the issuance of revenue bonds for the proposed facility. However, because we decline to construe "housing" in the manner advanced by plaintiffs, we find the maxim of construction cited by plaintiffs to be inapplicable to the present case.

that the enactment authorizing financing for the arts facility was proper under the Ohio Constitution. We note that the wisdom, from a policy standpoint, of the legislative enactment at issue is not a matter within the domain of this court. The duty of this court is limited to construing and applying the law. *Nelson v. State* (1931), 41 Ohio App. 174, 181, 180 N.E. 84, 86.

Accordingly, plaintiffs' assignment of error is not well taken and is overruled, and the judgment of the trial court is hereby affirmed.

*Judgment affirmed.*

BRYANT and PETREE, JJ., concur.

PEGGY BRYANT, Judge, concurring.

I cannot agree with the conclusion of the majority that the language "for such capital improvements" set forth in paragraph five of Section 2i, Article VIII refers to certain capital improvements enumerated in paragraph one of Section 2i, Article VIII. Thus, I disagree with the majority's reading of the phrase "acquisition, construction, reconstruction, or other improvements of, and provision equipment for * * * state buildings and structures" from paragraph one in conjunction with the phrase "for * * * housing of branches and agencies of state government" from paragraph five.

However, as the majority notes, the issue to be determined is whether the facility at issue is a capital improvement for "housing of branches and agencies of state government" within the parameters of paragraph five. For the reasons set forth in the remainder of the majority opinion, I concur.