DEXXON DIGITAL STORAGE, INC., Appellant,

v.

HAENSZEL et al., Appellees.

[Cite as *Dexxon Digital Storage, Inc. v. Haenszel,*
161 Ohio App.3d 747, 2005-Ohio-3187.]

Court of Appeals of Ohio,
Fifth District, Delaware County.

No. 04CAE11074.

Decided June 20, 2005.

</div>

748

Susan M. Dimickele and Lori Maiorca Zancourides, for appellant.

Dennis L. Pergram, for appellee.

BOGGINS, Judge.

{¶ 1} This is an appeal by plaintiff-appellant, Dexxon Digital Storage, Inc., from the October 27, 2004 decision of the Delaware County Court of Common Pleas denying its motion for a preliminary injunction.

{¶ 2} There are seven appellees: John Roth, William Kleeh, Douglas Brochar, Andrew Haenszel, Nathan Williams, Larry Pangalangan, and Tony Somers.

## STATEMENT OF THE FACTS AND CASE

{¶ 3} Appellant, Dexxon Digital Storage, Inc. ("Dexxon"), was formed in June 2003 for the purpose of acquiring certain assets of Digital Storage, Inc. ("DSI") and its parent company Daisytek International ("Daisytek"), which were in bankruptcy proceedings. The acquisition was memorialized in a document entitled "Asset Purchase Agreement Between Dexxon Digital Storage, Inc. and Digital Storage, Inc."

{¶ 4} Dexxon engages in the business of wholesale data-storage media and hardware, primarily compact discs, digital videodiscs, and magnetic tape. Dexxon obtains these forms of data storage products from manufacturers and then sells them to its customers, who, in turn, resell them to end users who need these

data-storage products to store large amounts of information as part of their businesses.

{¶ 5} Appellees John Roth, William Kleeh, Douglas Brochar, Andrew Haenszel, Nathan Williams, and Larry Pangalangan were initially employees of DSI, then Daisytek, and then Dexxon.

{¶ 6} After Daisytek's acquisition of DSI, those six appellees were asked to sign a document entitled "Agreement Regarding Certain Terms and Conditions of Employment," which included covenants not to compete.

{¶ 7} On May 7, 2003, DSI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

{¶ 8} On June 3, 2003, Daisytek filed a voluntary petition for relief under Chapter 11.

{¶ 9} Dexxon was the successful bidder at the bankruptcy auction. Dexxon also purchased some of the assets of DSI pursuant to the asset-purchase agreement and the bankruptcy order approving it.

{¶ 10} The named appellees became employees of Dexxon, and several weeks into their employment, they were asked on numerous occasions to sign new covenants not to compete. Appellees all refused to sign.

{¶ 11} On October 31, 2003, these Dexxon employees, Roth, Kleeh, Brochar, Williams, Pangalangan, and Haenszel, along with another man named Tony Somers, established an internet domain name for a company called Capital Media. Capital Media is a competitor of Dexxon. Somers is the president of Capital Media. He has been in the computer-supply business for 19 years. He was never an employee of DSI, Daisytek, or Dexxon.

{¶ 12} On November 17, 2003, Capital Media was registered with the Ohio Secretary of State as a limited-liability company.

{¶ 13} On November 21, 2003, Haenszel submitted a letter of resignation. Pursuant to an agreement between Dexxon and Haenszel, Dexxon would pay Haenszel through December 12, 2003.

{¶ 14} On or about November 24, 2003, Dexxon terminated the employment of Kleeh, Brochar, Williams, and Pangalangan.

{¶ 15} On December 15, 2003, appellees published the Capital Media Business Plan.

{¶ 16} On January 1, 2004, Capital Media opened its business operations to the public.

{¶ 17} Appellant Dexxon learned that Capital Media was conducting business in direct competition with it, and on February 9, 2004, Dexxon filed a complaint

against appellees in the Delaware County Court of Common Pleas alleging claims of breach of noncompetition and confidentiality contracts, misappropriation of trade secrets, breach of duty of loyalty, and tortious interference with business and contractual relations against each named defendant-appellee. Appellant also alleged claims of fraud against Haenszel, Roth, and Williams. Appellant also filed a motion for preliminary injunction seeking to enjoin appellees from competing against it and from disclosing trade secrets.

{¶ 18} On May 6, 7, and 10, 2004, the magistrate conducted a two-and-a-half-day hearing in this matter, receiving evidence in the form of oral testimony from witnesses as well as documentary and demonstrative exhibits. Posttrial briefs and proposed findings of fact and conclusions of law were also submitted following the hearing.

{¶ 19} On July 19, 2004, the magistrate filed a 24–page decision and entry, recommending that the trial court enjoin defendants-appellees from using or disclosing plaintiff-appellant's trade secrets but recommending that the trial court deny the injunction as to noncompetition.

{¶ 20} The parties filed objections to the magistrate's decision.

{¶ 21} On October 27, 2004, the trial court filed a decision and entry, which accepted the magistrate's recommendation as to noncompetition but declined the recommendation to enjoin appellees as to trade secrets, thereby overruling plaintiff-appellant's motion for preliminary injunction. The trial court disagreed with the magistrate's conclusion that appellees had misappropriated appellant's trade secrets and further found that Ohio's Uniform Trade Secrets Act did not apply to limited-liability companies.

{¶ 22} It is from this decision that appellant appeals, assigning the following errors for review:

## ASSIGNMENTS OF ERROR

{¶ 23} "I. The trial court erred in finding that the individual defendants could not have misappropriated the trade secrets of Dexxon Digital Storage as defined by Ohio's Uniform Trade Secrets Act.

{¶ 24} "II. The trial court erred in finding that a limited liability company is not a 'person' under Ohio's Uniform Trade Secrets Act, Ohio Rev.Code § 1333.61.

{¶ 25} "III. The trial court erred in finding that Dexxon Digital Storage did not acquire the noncompete agreements as part of the asset purchase of Digital Storage, Inc.

{¶ 26} "IV. The trial court erred in finding that Dexxon Digital Storage was not a successor entitled to enforce the noncompete agreements."

{¶ 27} Appellee's cross-assignment of error will not be addressed, as appellee failed to file a notice of cross-appeal in accordance with App.R. 3(c).

I

{¶ 28} In its first assignment of error, appellant Dexxon argues that the trial court erred in denying its motion for preliminary injunction, finding that appellees could not have misappropriated trade secrets under Ohio's Uniform Trade Secrets Act ("UTSA"). We agree.

{¶ 29} What is generally proscribed under trade secret laws is the misappropriation of the information obtained from the person holding the trade secret and later conversion of the information to the use and gain of the person obtaining the secret. *Consumer Direct, Inc. v. Limbach* (1991), 62 Ohio St.3d 180, 183, 580 N.E.2d 1073. To constitute a trade secret, the information must be both unique and competitively advantageous. *Wiebold Studio, Inc. v. Old World Restorations, Inc.* (1985), 19 Ohio App.3d 246, 19 OBR 398, 484 N.E.2d 280. Trade secrets are generally thought of as things that give an employer a competitive advantage over another, and as such are extremely coveted. Id.

{¶ 30} The UTSA is codified in R.C. 1333.61 to 1333.69. R.C. 1333.62(A) provides that actual or threatened misappropriation of a trade secret may be enjoined.

{¶ 31} Courts, in determining whether to grant injunctive relief, take into consideration the following four factors: (1) the likelihood of a plaintiff's success on the merits, (2) whether the issuance of the injunction will prevent irreparable harm to the plaintiff, (3) what injury to others will be caused by the granting of the injunction, and (4) whether the public interest will be served by the granting of the injunction. *Corbett v. Ohio Bldg. Auth.* (1993), 86 Ohio App.3d 44, 49, 619 N.E.2d 1145.

{¶ 32} The decision whether to grant or deny an injunction rests in the sound discretion of the trial court and will not be disturbed by a reviewing court absent a clear abuse of discretion. *Garono v. State* (1988), 37 Ohio St.3d 171, 173, 524 N.E.2d 496. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140. We must look at the totality of the circumstances in the case sub judice and determine whether the trial court acted unreasonably, arbitrarily, or unconscionably.

{¶ 33} Each element must be proven by clear and convincing evidence before the trial court can order a preliminary injunction. *Vanguard Transp.*

*Sys., Inc. v. Edwards Transfer & Storage Co., Gen. Commodities Div.* (1996), 109 Ohio App.3d 786, 792–793, 673 N.E.2d 182.

{¶ 34} R.C. 1333.61, which contains the definitions for the UTSA, states:

{¶ 35} "As used in sections 1333.61 to 1333.69 of the Revised Code, unless the context requires otherwise:

{¶ 36} "(A) * * *

{¶ 37} "(B) 'Misappropriation' means any of the following:

{¶ 38} "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

{¶ 39} "(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

{¶ 40} "(a) Used improper means to acquire knowledge of the trade secret;

{¶ 41} "(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

{¶ 42} "(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

{¶ 43} "(C) 'Person' has the same meaning as in division (C) of section 1.59 of the Revised Code and includes governmental entities.

{¶ 44} "(D) 'Trade secret' means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

{¶ 45} "(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

{¶ 46} "(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

{¶ 47} In reviewing a trial court's decision to grant or deny an injunction, the standard of review is abuse of discretion. *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgmt. Dist.* (1995), 73 Ohio St.3d 590, 653 N.E.2d 646,

paragraph three of the syllabus. "Abuse of discretion" connotes more than an error on the trial court's part; the decision must be shown to be arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 48} In the case sub judice, the trial court denied the preliminary injunction as to the misappropriation of trade secrets, stating that there was "no finding that Defendants disclosed or used Plaintiff's trade secrets without Plaintiff's consent" and further that there was "no finding that the person acquiring the trade secrets knew or had reason to know that the trade secrets were acquired by improper means, under circumstances giving rise to a duty to maintain its secrecy or limits it [sic] use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use."

{¶ 49} R.C. 1333.62(A) provides that actual or *threatened* misappropriation of a trade secret may be enjoined. Therefore, the issuance of an injunction does not hinge on appellant's proving that the appellees used the trade secrets, as threatened misappropriation of a trade secret is sufficient to allow the trial court to enjoin future use.

{¶ 50} In *Procter & Gamble Co. v. Stoneham* (2000), 140 Ohio App.3d 260, 747 N.E.2d 268, the First District Court of Appeals held that a former employer, in seeking to enjoin its former employee from disclosing trade secrets to a competitor, was not required to prove actual harm but could prevail on evidence of a threat of harm, including evidence that the employee had an intimate knowledge of the employer's confidential information and trade secrets and that the employee's new position with the competitor resulted in direct competition between products that the employee had formerly supported and new products for which he had responsibility.

{¶ 51} "According to the inevitable-disclosure rule, a threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." Id. at 274, 747 N.E.2d 268.

{¶ 52} "Inevitable disclosure is not a concept limited to the law of trade secrets and misappropriation. Thus, for example, the courts have recognized that 'it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well intentioned the effort may be to do so.' *FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C.Cir.1980); *see also Sullivan Marketing, Inc. v. Valassis Comm., Inc.*, 1994 WL 177795 at *3 (S.D.N.Y.1994). Those cases recognize that, once a person has knowledge of a competitors [sic]

business information, when they are called upon to act on behalf of his own company, his ability to compartmentalize the knowledge of his competitor's been [sic] is 'nigh impossible.' *Sullivan,* 1994 WL [177795] at *3." *PepsiCo, Inc. v. Redmond* (N.D.Ill. Jan. 02, 1996) No. 94 C 6838, 1996 WL 3965.

{¶ 53} Under the facts of the instant case, this court cannot find that any less is true of appellees' ability (or inability) to compartmentalize their knowledge of Dexxon's trade secrets and confidential information and to refrain from using that information in their jobs at Capital Media.

{¶ 54} Appellant's first assignment of error is sustained.

## II

{¶ 55} In its second assignment of error, appellant argues that the trial court erred in finding that a limited-liability company is not a "person" under Ohio's UTSA. We agree.

{¶ 56} As stated above, R.C. 1333.61, in defining "person," states:

{¶ 57} "(C) 'Person' has the same meaning as in division (C) of section 1.59 of the Revised Code and includes governmental entities."

{¶ 58} R.C. 1.59(C) provides:

{¶ 59} "As used in any statute, unless another definition is provided in that statute or a related statute:

{¶ 60} " * * *

{¶ 61} "(C) 'Person' includes an individual, corporation, business trust, estate, trust, partnership, and association."

{¶ 62} The trial court, not finding limited-liability companies specifically listed therein, held that limited-liability companies are not covered under the UTSA.

{¶ 63} "Under Ohio law, as elsewhere, an LLC is neither a corporation nor a partnership, as those concepts are commonly understood. Instead, an LLC is a hybrid in that it is a form of legal entity that has attributes of both a corporation and a partnership but is not formally characterized as either one." *In re ICLNDS Notes Acquisition, LLC* (Bankr.N.D.Ohio 2001), 259 B.R. 289, 292.

{¶ 64} "Under Ohio law, a limited liability company ('LLC') is neither a corporation nor a partnership, as those concepts are commonly understood but, instead, is a hybrid. See R.C. 1705.01 *et seq.* Logically, given that an LLC has some of the attributes of a corporation and some of a partnership, an LLC should be governed by the same rules that apply to those entities. Since a LLC's articles of organization are similar to a corporation's articles of incorporation, and include information similar thereto, the laws regarding corporate organization

should apply." *Shampton v. Springboro* (Nov. 13, 2001) 12th Dist.App. No. CA 2000–08–080, 2000–09–081, 2001 WL 1403051, reversed on other grounds (2003), 98 Ohio St.3d 457, 2003-Ohio-1913, 786 N.E.2d 883.

{¶ 65} Upon reviewing the case law, we find that while this issue may be one of first impression, a number of courts in Ohio have applied the UTSA to limited-liability companies. See *Curcio Webb, LLC v. Natl. Benefit Programs Agency* (S.D.Ohio 2005) 367 F.Supp.2d 1191; *Extracorporeal Alliance, L.L.C. v. Rosteck* (N.D.Ohio 2003), 285 F.Supp.2d 1028; *Elite Acquisition Corp. v. Nsystems* (March 27, 2001), 10th Dist.App. No. 00AP–1014, 2001 WL 290232.

{¶ 66} We agree with appellant that to apply the UTSA to all other forms of business associations and entities but to allow limited-liability companies to be exempt from the restrictions and protections of the UTSA would subvert the purposes of the UTSA and create a loophole that could be used to avoid liability.

{¶ 67} We therefore find that the UTSA does apply to limited-liability companies.

{¶ 68} Appellant's second assignment of error is sustained.

### III

{¶ 69} In its third assignment of error, appellant argues that the trial court erred in finding that Dexxon did not acquire the noncompetition agreements as part of the asset purchase of DSI. We disagree.

{¶ 70} Appellant argues that it acquired the Daisytek noncompetition agreements pursuant to the Dexxon–DSI asset-purchase agreement. The agreement provides that the laws of the state of Ohio govern its construction and interpretation.

{¶ 71} In the agreement, the parties agreed that DSI would assign all of its rights in certain assets, including the following:

{¶ 72} "(f) * * *[A]ll material patents, inventions, trade secrets, proprietary rights, software, trademarks, trade names, service marks, logos and copyrights, and all applications, issuances, and other filings therefore, registrations thereof and licenses, sublicenses and agreements with respect thereto, including but not limited to those identified on Schedule 1.1(f).

{¶ 73} "(g) All rights under the executory contracts and unexpired leases identified on Schedule 1.1(g)."

{¶ 74} The above sections of the agreement do not address the Daisytek employment agreements.

{¶ 75} Section 4.6 of the agreement addressed the disposition of DSI's employees and their future employment with Dexxon. In that section, the agreement

provides that at the closing date of the agreement, Dexxon "shall offer employment to all employees listed on Schedule 4.6 in the column 'U.S. Associates.' Upon each such employee's acceptance of such offer, [DSI] shall, or shall cause its appropriate Affiliates (defined below) to, terminate the employment relationship of such employees effective no later than the first date of employment by [Dexxon]. [DSI] waives, and [DSI] shall cause its Affiliates to waive, any claims or rights [DSI] or such Affiliates may have against [Dexxon] and any employees of [Digital Storage] or its Affiliates who are extended an offer of employment by [Dexxon] arising from such employment by [Dexxon], including any claims arising under any employment agreement, confidentiality agreement or non-competition agreement between such person and [DSI] or its Affiliates."

{¶ 76} Based on these quoted sections, we find that the former DSI employees were actually terminated by DSI and then offered employment by Dexxon.

{¶ 77} Furthermore, the fact that the noncompetition agreements were in fact contemplated and specifically referred to in this section and not included elsewhere supports the position that they were not part of the asset purchase.

{¶ 78} Additionally, the repeated attempts by Dexxon to have the former DSI employees sign new noncompetition agreements lends support to the argument that Dexxon believed that the Daisytek agreements were not enforceable.

{¶ 79} Appellant's third assignment of error is overruled.

## IV

{¶ 80} In its fourth assignment of error, Dexxon argues that the trial court erred in finding that Dexxon was not a successor entitled to enforce the noncompetition agreements. We disagree.

{¶ 81} Appellant argues that it is the lawful successor of DSI because "it seamlessly became the new employer of all [DSI's] employees, * * * carrying on the business and management of the company without disruption or change." Appellant argues that it therefore has the right to enforce any agreements of DSI, including any noncompetition agreements. In support of this argument, appellant cites cases dealing with consolidation or merger in addition to a case where a sole proprietor incorporated his business.

{¶ 82} Upon review, we find, as stated above, that the former DSI employees were actually terminated by DSI and then offered employment by Dexxon.

{¶ 83} For that reason and our finding that Dexxon did not acquire the employment agreements as a result of the asset purchase, we find that Dexxon was not a successor entitled to enforce the noncompetition agreements.

{¶ 84} Appellant's fourth assignment of error is overruled.

{¶ 85} Accordingly, the judgment of the Delaware County Court of Common Pleas is affirmed in part and reversed in part.

Judgment affirmed in part
and reversed in part.

GWIN and HOFFMAN, JJ., concur.