JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Appellant Berardi's Fresh Roast Inc. ("Berardi's") appeals the trial court's granting of summary judgment in favor of appellees Michael Caruso, Paul Petznick, Mark Huelsman, Lisa Bush, and PMD Enterprises, Inc., dba as Caruso's Coffee (hereinafter collective known as "Caruso's" unless otherwise identified), on Berardi's claims for misappropriation of trade secrets, unfair competition, tortious interference with contract and business relations, unfair trade practices, and civil conspiracy. In addition, Berardi's appeals the trial court's granting of summary judgment in favor of Michael Caruso on his counterclaim for unpaid payments for deferred compensation, and the trial court's nunc pro tunc entry regarding damages. Berardi assigns seven errors for our review.[1]
 {¶ 2} Having reviewed the record and apposite facts, we reverse in part the trial court's decision to grant summary judgment on Berardi's misappropriation of trade secrets and conspiracy claims. We affirm the trial court's judgment on the remaining claims and Michael Caruso's counterclaim.
 Facts {¶ 3} Michael Caruso and his wife Angela Berardi-Caruso founded Berardi's Fresh Roast in 1986. The enterprise was small at first, with the *Page 4 
Caruso's roasting and selling the coffee from a small retail store. Berardi's grew into a nationally recognized specialty coffee provider based on Michael Caruso's roasting abilities. Caruso established certain styles of roasting the coffee beans to create unique flavors.
 {¶ 4} The Carusos divorced in 2000. As part of the divorce agreement, Michael Caruso agreed to sell his interest in the company to his ex-wife, Angela Berardi. In addition, Caruso entered into a noncompetition agreement which prevented him from re-entering the coffee industry for three years. The noncompetition agreement expired on April 19, 2003. In exchange, his ex-wife agreed to pay Caruso $900,000. The parties also entered into an agreement in which Berardi's agreed to make quarterly installments in the form of deferred compensation to compensate Caruso for his exemplary past performance with the company.
 {¶ 5} In May 2002, Caruso's adult sons asked him to consider returning to the coffee business after his noncompetition agreement with Berardi's expired. Caruso's ex-wife sold her interest in Berardi's to her divorce attorney; therefore, the sons no longer would receive the company as an inheritance. Caruso agreed to reenter once the three year noncompetition agreement expired.
 {¶ 6} Prior to the expiration of the noncompetition agreement, Caruso approached various financial entities to investigate preliminary financing for the *Page 5 
new business; he also gathered information regarding pricing, product, and availability of supplies from various vendors; four months prior to the expiration of the agreement, Caruso began placing orders for equipment used in the coffee industry; two months prior to the expiration of the agreement, he signed a lease for warehouse space; two weeks prior to the expiration of the agreement, he took possession of the warehouse and equipped the facility so that the new company would be ready for business after April 19, 2003. The result was the creation of PMD Enterprises, Inc. dba Caruso's Coffee, which was in the business of creating custom blend coffee under the registered name of Caruso's Coffee.
 {¶ 7} One customer, West Point Market ("West Point"), changed to Caruso's Coffee. The President of West Point, Larry Uhl, stated he switched from Berardi's to Caruso's because of Michael Caruso's reputation as a coffee roaster, and the fact Caruso's Coffee was less expensive than Berardi's. Uhl also stated that he preferred the taste of Caruso's coffee.
 {¶ 8} Former Berardi employees, Paul Petznick, Mark Huelsman, and Lisa Bush, also decided to leave Berardi's and became employed at Caruso's.
 {¶ 9} Berardi's filed suit against Michael Caruso, Caruso's Coffee, and former Berardi employees, Paul Petznick, Mark Huelsman, and Lisa Bush. In its complaint, Berardi's alleged tortious interference with business, breach of the noncompetition agreement, theft of trade secrets, deceptive trade practices, *Page 6 
civil conspiracy, and destruction or conversion of Berardi's personal property. Michael Caruso counterclaimed claiming Berardi's failed to make payments due and owing under the terms and conditions of the deferred compensation agreement totaling $53,964, plus interest.[2]
 {¶ 10} The appellees filed motions for summary judgment on Berardi's claims. The trial court granted summary judgment in favor of Caruso's on Berardi's claims; the trial court also granted Michael Caruso's counterclaim for nonpayment of the deferred compensation amounts. Caruso's Coffee, Petznick, Huelsman, and Bush voluntarily dismissed their counterclaims so that the matter could proceed to appeal.
 Standard of Review {¶ 11} We review an appeal from summary judgment under a de novo standard of review.[3] Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.[4] Under Civ. R. 56, summary judgment is appropriate *Page 7 
when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can reach only one conclusion which is adverse to the non-moving party.[5]
 {¶ 12} The moving party carries an initial burden of setting forth specific facts which demonstrate his or her entitlement to summary judgment.[6] If the movant fails to meet this burden, summary judgment is not appropriate; if the movant does meet this burden, summary judgment will be appropriate only if the non-movant fails to establish the existence of a genuine issue of material fact.[7]
 Trade Secrets {¶ 13} In its first assigned error, Berardi's contends the trial court erred by granting summary judgment in favor of Michael Caruso and Caruso's Coffee on Berardi's claim that Caruso and Caruso's Coffee stole Berardi's trade secrets by using Berardi's coffee blend formulas to make Caruso's Coffee blends.
 {¶ 14} The noncompetition agreement signed as part of the Caruso divorce proceedings stated in pertinent part as follows: *Page 8 
 "After the noncompete period, (i) Selling Shareholder agrees to keep secret and retain the strictest confidence and shall not use for his benefit or the benefit of others and not to directly or indirectly disclose to anyone outside of Berardi's any Trade Secrets (as hereinafter defined) or use any Trade Secrets other than pursuant to activities for the benefit of Berardi's and (ii) Selling Shareholder shall not use, or permit any person, association, firm, corporation, limited liability company, or other entity to use in any manner, directly or indirectly, any Trade Secrets.
 "The term `Trade Secrets,' as used throughout this Section 2(b) means Trade Secrets as defined by Ohio Law in O.R.C. 1333.61(D) et seq. and relevant case law thereunder."
 {¶ 15} It is undisputed that the formulas developed by Michael Caruso when he worked at Berardi's constitute Berardi's trade secrets. The issue is whether Caruso used these formulas in creating Caruso's various coffees. The formulas consist of both the origin of the beans (i.e. Africa, Columbia, Brazil) and percentage used of each type of bean.
 {¶ 16} Berardi's argues that Caruso's misappropriated the coffee formula of West Point Market, a former Berardi's client. Caruso contends the formula was owned by West Point because West Point employee, Russ Vernon, contributed to the development of the formula with Caruso's ex-wife prior to Berardi's even being formed. According to Caruso, although Berardi's produced the coffee for West Point, it used West Point's formula. The president of West Point, Larry Uhl, also thought West Point owned the formula based on the history of its origin and the fact the coffee was sold under West Point's label. *Page 9 
 {¶ 17} Brian and Patrick Leneghan, owners of Berardi's, contend, however, that Berardi's owned the West Point formula. Although Larry Uhl stated that Caruso's West Point Blend tasted distinctively different than Berardi's blend, Michael Caruso admitted this was due to his roasting style and not a change in the formula.[8] Therefore, the same formula is used. Caruso contends West Point provided him with the formula; however, Larry Uhl stated that West Point did not give Caruso the formula.
 {¶ 18} Moreover, according to Patrick Leneghan, West Point did not know the ingredients and percentage of beans of the formula, because West Point contacted Berardi's sometime prior to April 19, 2003 to request the information. Therefore, even if Russ Vernon gave Caruso the formula as Caruso's contends, there is still a question of fact whether the formula was Berardi's property.
 {¶ 19} Thus, based on this evidence, whether Berardi's or West Point owns the formula is an issue of fact that is in dispute. If Berardi's owned the formula, then Caruso's misappropriated trade secrets belonging to Berardi's by producing the West Point blend.
 {¶ 20} We conclude, however, that there is no fact in dispute regarding the creation of the other blends by Caruso's. Berardi's contends the so called "cheat *Page 10 
sheet" developed by Caruso's indicates there is a question of fact whether Caruso's is using the same formulas. The cheat sheet sets forth three columns. The first column is entitled "past" and lists Berardi's blends underneath. The second column is entitled "others" and lists a few other Berardi's blends. The third column is entitled "present" and lists Caruso's blends underneath.
 {¶ 21} Caruso's office manager, Diane Morelli and Renee Desantis of inside sales, testified that the sheet was used internally by Caruso's. According to them, if a former Berardi's customer inquired whether Caruso's carried a similar brand to the Berardi's brand it was using, the sales people could answer by supplying the comparable Caruso's blend name. There was no competent evidence to contradict this testimony. Brian Leneghan contends Caruso's employees were using the sheet as a sales tool to market Caruso's coffee as the "same" as Berardi's, only cheaper; however, his testimony was based on hearsay evidence. No evidence was presented by actual customers that this was in fact done.
 {¶ 22} Caruso's also submitted under seal the formulas of both its blends and the comparable Berardi's blends as displayed on the so-called cheat sheet. Review of this exhibit indicates that Caruso's blends consist of different beans and percentages than Berardi's comparable blends. Berardi's does not dispute the accuracy of this comparison. *Page 11 
 {¶ 23} Berardi's also contends Caruso's misappropriated its trade secrets by using its client list. We agree that a client list can constitute a trade secret. However, the list is only a trade secret if the information "derives its independent economic value * * * from not being generally known to, and not readily ascertainable by proper means by, other persons * * *."[9]
 {¶ 24} In the instant case, the evidence indicated that Caruso's client list was developed by searching the yellow pages and internet, customer referrals, and by spotting potential customers while traveling. Although there may have been some overlap with Berardi's clients, there is no indication Berardi's clients were specifically targeted.
 {¶ 25} Berardi's relies on this court's case in Giovinazzi v.Chapman[10] to argue that client lists, even obtained from sources available to the general public, can result in the misappropriation of secrets. However, in that case, the appellee not only obtained the client's address and phone number, it also obtained the type and amount of coffee the client purchased, along with the type of coffee equipment each location possessed. In the instant case, there is no *Page 12 
evidence that Caruso's list contained any information other than the client's name, address, and telephone number.
 {¶ 26} Berardi's also relies on the cases of Proctor and Gamble Co. v.Stoneham[11]
 {¶ 27} and Dexxon Digital Storage, Inc. v. Haenszel[12] to support its argument that the employment of Berardi's employees violated the rule against inevitable disclosure. This doctrine holds that a threat of harm warranting injunctive relief exists when an employee with specialized knowledge commences employment with a competitor. However, this doctrine is applied when a former employer seeks "injunctive" relief when a former employee begins work with a competitor while the noncompetition clause has not expired. In the instant case, injunctive relief is not at issue, and the employees were hired after the noncompetition clause expired. Therefore, this argument does not apply to the instant case. Accordingly, Berardi's first assigned error has merit in part as to the dispute regarding the ownership of the West Point blend and overruled as to the other arguments.
 Unfair Competition *Page 13 {¶ 28} In its second assigned error, Berardi's contends the trial court erred by granting summary judgment on its unfair competition claim. Berardi's argues that Caruso's violated the competition agreement by forming Caruso's Coffee, hiring employees, and ordering equipment and supplies prior to the expiration of the noncompetition agreement. We disagree.
 {¶ 29} It is undisputed that Caruso's actions constituted "preparations" to compete. However, Berardi's contends that Caruso's preparations to compete prior to the expiration of the noncompetition agreement violates the agreement. In so arguing, Berardi's relies on the Federal District case, Plastech Eng. Produce v. Cooper.[13] However inPlastech, the competitor was sending price quotations to prospective clients prior to the expiration of the noncompetition agreement. The competitor's action in that case goes beyond Caruso's actions. Caruso was not actively engaging in the coffee industry. Instead, he was merely making preparations so that he could commence business the day after the noncompetition agreement expired.
 {¶ 30} Although Caruso sent out a mass mailing to potential clients, he did not do so until after the expiration of the noncompetition agreement. In fact, *Page 14 
Caruso testified that when potential customers contacted him prior to the expiration agreement, he told them he was not in business yet. As we held in
 {¶ 31} Cary Corp. v. Linder[14] "`preparing to compete' is not equivalent to `competing.'" While the employee in Linder was not subject to a noncompetition agreement, we conclude the same principal applies to the case herein. That is, preparing to compete does not equate to actively competing.
 {¶ 32} Berardi's also contends Michael Caruso secured the trade name "Great Lakes Gourmet Coffee" prior to the expiration of the noncompetition agreement, in order to prevent Berardi's from selling coffee to Marc's under this brand name. However, according to Caruso, he registered the Great Lakes trade name in the late 1990s.[15] He did so privately and not on behalf of Berardi's because at the time, he was experiencing domestic problems with his then wife, Angela.[16] This was prior to the execution of the noncompetition agreement in April 2000. Berardi's failed to present evidence indicating the trade name was not in fact registered at this earlier time. Therefore, the registration did not constitute unfair competition. *Page 15 
 {¶ 33} Berardi's also contends that Michael Caruso solicited Berardi's roaster, Mark Huelsman, for employment in February 2003, while the noncompetition agreement was in effect and while Huelsman was still employed at Berardi's. Caruso denied speaking to Huelsman until after the expiration of the noncompetition agreement. Huelsman admitted that in February 2003, he had lunch with Caruso's son, who is his cousin and good friend. He stated that at that lunch the son told him that his father was going back into business, but there was no discussion regarding his future employment.[17] According to Huelsman, no offer of employment was made until the last weekend in April, after the expiration of the agreement. Therefore, there is no evidence to support Berardi's contention that Caruso solicited Huelsman while the noncompetition agreement was in effect. Accordingly, Berardi's second assigned error is overruled.
 Tortious Interference {¶ 34} In its third assigned error, Berardi's contends Caruso's, and its employees, Lisa Bush and Paul Petznick, interfered with Berardi's customer relationships by inducing customers to terminate their business with Berardi's. *Page 16 
Berardi's also claims Caruso's interfered with Berardi's employee relationships by hiring Huelsman while the noncompetition agreement was still in effect.
 {¶ 35} The elements of tortious interference with a contract are: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages.[18]
 {¶ 36} The Ohio Supreme Court has held that "fair competition" is a proper ground or justification for interference, but limited it to situations where an existing contract is terminable at will.[19] There is no evidence that the customers that Berardi's lost to Caruso's had contracts that were not terminable. Therefore, the fair competition justification for interfering with contracts applies.
 {¶ 37} In order to overcome this justification, the plaintiff bears the burden of showing that the competitor acted with actual malice.[20] "Actual malice in a tortious interference claim is not ill-will, spite, or hatred; rather, it denotes an *Page 17 
unjustified or improper interference with the business relationship."[21] In the instant case, Caruso's informing potential clients that its coffee tastes better and was less expensive, does not constitute "actual malice." It contacted Berardi's clients in the spirit of fair competition, as the contact occurred after the noncompetition agreement expired. Caruso's was not indefinitely precluded from contacting Berardi's customers.
 {¶ 38} There is no evidence Caruso's interfered with Berardi's employee relations by soliciting Berardi employees. There was no evidence that Berardi employees were bound by a contract; therefore, there was no tortious interference. Moreover, as we discussed above, Huelsman was not offered employment until after the noncompetition agreement expired. Accordingly, Berardi's third assigned error is overruled.
 Unfair Trade or Deceptive Trade {¶ 39} In its fourth assigned error, Berardi's contends Caruso's engaged in unfair or deceptive trade practices. We disagree.
 {¶ 40} Berardi's contends that Caruso's engaged in unfair competition by giving customers the aforementioned "cheat sheet" comparing the coffee of Berardi's with Caruso's Coffee. Berardi's contends the sheet gives the *Page 18 
impression that Caruso's Coffee is the same as Berardi's. There was no competent evidence presented that the sheet was presented to customers. As we stated before, Diane Morelli and Renee Desantis both stated in their depositions that the sheet was for internal use. Desantis also stated that the sheet would not have been given to customers because it contained proprietary information.
 {¶ 41} Brian Leneghan testified in his deposition that various Berardi's customers had told him that Caruso's sales people were giving them the cheat sheet and representing that the brands were the same, only cheaper. However, his statements were based on hearsay. Berardi's never introduced a deposition or affidavit from a customer alleging that Caruso's was doing this.
 {¶ 42} Berardi's also claims that Caruso's was placing its coffee in Berardi's bins at grocery stores. Brian Leneghan, however, admitted the grocery store employees were responsible for commingling the products.[22] Caruso's cannot be held responsible for the grocery store's error because it has no control over how the grocery stores place the coffee in the bins.
 {¶ 43} Berardi's also contends that Caruso's employees were sabotaging its equipment at customer locations. There was no evidence, beyond speculation, *Page 19 
that Caruso's employees were sabotaging the equipment of Berardi's customers. There was an allegation that Paul Petznick failed to repair equipment for a particular client, but that does not amount to sabotage.[23] Brian Leneghan also stated that a customer told him that Paul Petznick sabotaged its coffee grinders. However, this was hearsay; Berardi's failed to submit the deposition or affidavit of this client attesting to this allegation. Accordingly, Berardi's fourth assigned error is overruled.
 Conspiracy {¶ 44} In its fifth assigned error, Berardi's contends if we resurrect one of its tort claims, its civil conspiracy claim should also be resurrected. We agree.
 {¶ 45} The elements of civil conspiracy are: (1) a malicious combination of two or more persons, (2) resulting in injury to person or property, and (3) existence of an unlawful act independent of the conspiracy.[24] As we discussed in the first assigned error, there is an issue of fact as to whether Caruso's misappropriated West Point's coffee formula. Because Michael Caruso produces the coffee on behalf of Caruso's Coffee and uses employees to do so, there is an *Page 20 
issue of fact as to whether Caruso conspired to misappropriate the formula. Accordingly, Berardi's fifth assigned error is sustained in part.
 Counterclaim for Non-payment {¶ 46} In its sixth assigned error, Berardi's claims the trial court erred in granting summary judgment in favor of Michael Caruso for payments due to him under the noncompetition agreement. Berardi's contends that because Caruso breached the noncompetition agreement, it did not owe the payments. We disagree.
 {¶ 47} It is undisputed that Berardi's failed to pay the quarterly installments payable on December 1, 2000 in the amount of $15,964, and failed to make two payments in the amount of $19,000 payable on Dec. 1, 2002 and March 1, 2003. Therefore, the total amount due and owing is $53,964.
 {¶ 48} Berardi's claims it does not owe the amount because Caruso breached the noncompetition agreement. However, the noncompetition agreement was irrelevant to these payments, as the amount was owed pursuant to the deferred compensation agreement. The payments, as stated in the agreement, were being made to reward Caruso for his past performance:
 "Whereas, the Corporation, in recognition of Michael's contribution to the past progress and growth of the Corporation, and in recognition of his long experience and service in the Corporation, *Page 21 
has agreed to provide a deferred compensation payment program to Michael for his years of service to the Corporation."[25]
 {¶ 49} Therefore, because the payments were part of a separate agreement and based on Caruso's past performance, any breach of the noncompetition agreement by Caruso was irrelevant to these agreed to payments. Accordingly, Berardi's sixth assigned error is overruled.
 Nunc Pro Tune {¶ 50} In its seventh assigned error, Berardi's argues the trial court erred by entering a nunc pro tunc entry to insert the amount of damages. Berardi's claims a trial should have been conducted on the matter.
 {¶ 51} The court originally entered summary judgment in favor of Caruso on his counterclaim, but failed to enter the amount of damages. Berardi's appeal was dismissed for lack of a final appealable order. As a result, Caruso's filed a motion for nunc pro tunc for the court to insert the amount of damages. The court awarded the amount of $76,339.94, which included interest.
 {¶ 52} Berardi's claims the court's nunc pro tunc entry was inappropriate as a trial should have been conducted on the damages. This court recently held that the trial court correctly granted a motion for nunc pro tunc to insert the amount of damages in the journal entry when the amount was easily *Page 22 
ascertainable.[26] In the instant case, Caruso's damages were based on the amounts of the installments due and owing, which were set forth in the deferred compensation agreement. Caruso requested the amount plus statutory interest in his motion for summary judgment. Therefore, we conclude the trial court's failure to include this amount in its journal entry was merely an oversight; therefore, the nunc pro tunc entry was correctly entered. Accordingly, Berardi's seventh assigned error is overruled.
 {¶ 53} Judgment affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.
It is ordered that appellant and appellees share the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be issued out of this court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 23 
JAMES J. SWEENEY, A.J., and MARY EILEEN KILBANE, J., CONCUR
 APPENDIX
Assignments of Error "I. The trial court committed prejudicial error in dismissing Berardi's claim for misappropriation of trade secrets."
 "II. The trial court committed prejudicial error in granting summary judgment dismissing Berardi's claim for unfair competition which was based upon appellee Caruso's breach of the noncompetition agreement and appellees' misappropriation of trade secrets and other tortious misconduct."
 "III. The trial court committed prejudicial error in granting summary judgment dismissing Berardi's claim for tortious interference with contract and business relations."
 "IV. The trial court committed prejudicial error in granting summary judgment dismissing Berardi's claim for unfair trade practices under the Deceptive Trade Practices Act, R.C. Chapter 4165."
 "V. The trial court committed prejudicial error in granting summary judgment dismissing Berardi's claim for civil conspiracy."
 "VI. The trial court committed prejudicial error in granting summary judgment on Caruso's counterclaim that Berardi's breached the noncompetition agreement."
 "VII. The trial court committed prejudicial error in granting Caruso's motion for a nunc pro tunc entry awarding *Page 24 damages on the counterclaim for breach of the noncompetition agreement."
[1] See appendix.
[2] Caruso's Coffee and the former Berardi's employees also filed counterclaims; however, they voluntarily dismissed their claims so this matter could proceed to appeal.
[3] Baiko v. Mays (2000), 140 Ohio App.3d 1, citing Smiddy v. TheWedding Party, Inc. (1987), 30 Ohio St.3d 35; Northeast Ohio Apt. Assn.v. Cuyahoga Cty. Bd. of Commrs. (1997), 121 Ohio App.3d 188.
[4] Id. at 192, citing Brown v. Scioto Bd. of Commrs. (1993),87 Ohio App.3d 704.
[5] Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327.
[6] Dresher v. Burt, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107.
[7] Id. at 293.
[8] Caruso Depo. 158-159.
[9] R.C. 133.61(D)(1). See, also, State ex rel. Besser v. Ohio StateUniv., 89 Ohio St.3d 396, 402, 2000-Ohio-207 (information was not a trade secret because it was readily ascertainable from financial reports and other public records.)
[10] (Aug. 26, 1982), Cuyahoga App. No. 44241.
[11] (2000), 140 Ohio App.3d 260.
[12] 161 Ohio App.3d 747, 2005-Ohio-3197.
[13] (N.D. Ohio 2004), Ohio No. 3:01CV7658.
[14] Cuyahoga App. No. 80589, 2002-Ohio-6483.
[15] Caruso Depo. 83.
[16] Id.
[17] Huelsman Depo. 40-42.
[18] Fred Siegel Co. v. Arter Hadden, 85 Ohio St.3d 171,1999-Ohio-260.
[19] Id. at 178. See, also, Harris v. University Hospitals ofCleveland, Cuyahoga App. Nos. 76724 and 76785, 2002-Ohio-983.
[20] Andrews v. Carmody (2001), 145 Ohio App.3d 27.
[21] Chandler Assoc, Inc. v. America's Healthcare Alliance,Inc. (1997), 125 Ohio App.3d 572, 583.
[22] Brian Leneghan Depo. 158, 172.
[23] Patrick Leneghan Depo. 52.
[24] Universal Coach, Inc. v. New York City Transit Authority,Inc. (1993), 90 Ohio App.3d 284, 292; Kenty v. Transamerica Premium Ins.Co. (1995), 72 Ohio St.3d 415, 419.
[25] Deferred Compensation Agreement, page 1.
[26] Adrine v. Miles Landing Homeowner Ass'n, Cuyahoga App. No. 90302,2008-Ohio-3041. *Page 1